2024 IL App (1st) 211648

THIRD DIVISION
July 10, 2024

No. 1-21-1648

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 60112 |
| | ) | |
| DONNIE TURNER, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE DEBRA B. WALKER delivered the judgment of the court, with opinion.
Justices Lampkin and Van Tine concurred in the judgment and opinion.

**OPINION**

¶ 1   Defendant Donnie Turner[1] appeals his convictions after a jury trial of the offenses of being an armed habitual criminal and reckless discharge of a firearm. On appeal, defendant contends (1) his removal from the courtroom prior to jury selection violated his constitutional rights to due process, to be tried by an impartial jury, and to be present during a critical stage of the proceedings and (2) his conviction should be reversed where the State failed to prove beyond a reasonable doubt that he endangered the bodily safety of another when he discharged the firearm. For the following reasons, we reverse and remand for further proceedings.

---

[1]According to the indictment, defendant is also known as Donnie Fisher. Throughout the proceedings, the trial court referred to defendant as Donnie Fisher.

¶ 2                                    I. BACKGROUND

¶ 3      The State charged defendant with being an armed habitual criminal, unlawful use of a weapon by a felon (UUWF), aggravated battery to a peace officer, and reckless discharge of a firearm in connection with an incident that occurred on August 6, 2020. Defendant was alleged to have discharged a firearm in his mother's apartment, while she was in the residence.

¶ 4                                    A. *Pretrial Proceedings*

¶ 5      On September 23, 2020, defendant appeared before the court via video conference on the present case, as well as on another case where he was charged with criminal damage to government supported property. When the trial court informed defendant of the charges, he stated that he did not understand them because the court was "moving fast" and he could not record the proceeding. As the court again attempted to inform defendant of the charges, he asked the court to "go slower." The court read the charges a third time, and defendant stated that he did not understand them. As he continued to speak, the court responded: "Do not interrupt me. If you interrupt me one more time, young man, one more time I'm going to hold you in direct criminal contempt of Court for every time you interrupt me and I will do it."

¶ 6      The court appointed public defender Hussain Khan to represent defendant. Defendant disagreed with the appointment and stated that he was representing himself. This exchange followed:

          "THE COURT: I will explain that to you in a minute, sir. Go ahead.

           MR. KHAN: I'm requesting—

          DEFENDANT: I'm—

          THE COURT: Go ahead, Mr. Khan.

           MR. KHAN: I'm requesting a date. I'd like to set up a meeting with Mr. Fisher.

DEFENDANT: No. You're not requesting a date. You're not undermining my standing I have in play already. I've already stepped up in front of another Judge and I have a demand this way and no one has the Counsel authority to—without my written consent before so.

THE COURT: Go ahead, Mr. Khan. Finish.

MR. KHAN: Mr. Fisher. Mr. Fisher.

DEFENDANT: Your Honor, due to the—

THE COURT: I'm going to mute you, sir, if you don't stop. If you don't listen—if you don't stop and if you don't listen, I'm going to mute you.

DEFENDANT: Why—

THE COURT: Yes. Mr. Fisher, because you're not listening to me. I'm going to explain myself very clearly. You have a right—sit down. Sit down. Let the record reflect that the defendant left the cell. Let the record reflect that now he's sitting back down and he's speaking over me."

¶ 7    The court proceeded to inform defendant that he had a right to represent himself and that he would be advised of that right on the next court date. While the court spoke to defendant, he continued his interruptions. The court placed defendant on mute, and the record reflected that defendant "left the seated area of Zoom and that he interrupted this Court continuously." The trial court ordered a behavioral clinical examination (BCX) for defendant.

¶ 8    At the next court date, which also proceeded via video conference, defendant reiterated his wish to represent himself. It is sufficient to state that as the trial court judge attempted to admonish him of his right to self-representation, defendant responded rudely, continuously interrupted the judge, and would not give yes or no answers. The judge continued with the admonishments,

informing defendant of the charges against him and the sentencing range for those offenses and inquiring about defendant's education and experience in the courtroom. The trial judge admonished defendant that, "[o]nce you begin, you will be on your own. Do you understand that?" This exchanged followed:

"DEFENDANT: If you choose to have me go through these proceedings without assistance of counsel in compliance with the United States Constitution, then then [*sic*] that's your decision, your Honor.

THE COURT: You can have a public defender right now if you want to. Do you?

DEFENDANT: I do not desire to have anyone represent me. However, the law again—although Constitution requires me to be provided with effective assistance of counsel and if you have any degree of understanding of the human language, the word assistance mean [*sic*] an aide. Counsel being an advisor. *** So, therefore, your decision to actively have me undergo these proceedings without someone effectively assisting me so as to advise me in the court of the proceedings is a direct violation of the Constitution and as I am considerably aware of, you took an oath to uphold that Constitution by not affording me equal opportunities under the law, equal protection under the law—

THE COURT: Do you want a public defender, sir?

DEFENDANT:—to assist me in the light of the fact that the COVID-19 keeping me from doing things and obtaining Grand Jury meetings and transcript. Of course I need assistance ***.

THE COURT: I will appoint a public defender.

DEFENDANT: No, you are not.

THE COURT: Public defender appointed.

- 4 -

DEFENDANT: I don't want nobody to represent me.

THE COURT: It's either a P.D. or you are by yourself. Which one is it?

DEFENDANT: Okay, for the record, reflect you're making me make a decision to proceed on this proceedings [*sic*] on my own.

THE COURT: That's what you are requesting.

DEFENDANT: You attempt to admonishing [*sic*] me. Let me take my time I am admonishing you. You took an oath to uphold the Constitution. If you violate, I will file a complaint to have you to the Commission that you violate my position. Let that be known to you."

The trial judge then recused herself from the matter.

¶ 9 Defendant's case was assigned to another trial judge. The court informed defendant of his right to proceed *pro se*, but it noted that a BCX had been ordered and the court needed to know whether defendant was fit to stand trial. Defendant tried to file motions and argued that he had not been properly arraigned. Since defendant continued to speak and argue with the new trial judge, he was again muted during the Zoom court proceeding.

¶ 10 The BCX was not yet complete on the following court date. The trial court explained to defendant that if "you are fit to stand trial, then you will be deemed fit to waive your right to counsel, and we'll have a conversation then and I'll determine whether or not you'll be permitted to waive counsel." The cause was continued "by agreement." Defendant responded that he was "not actually going by agreement. At the end of the day, counsel is fired. I'm not allowing this individual to speak on my behalf."

¶ 11 At the next court date, the trial court received defendant's BCX results indicating that he was fit to stand trial. Defendant stated that he still wished to proceed *pro se*. The trial court, like

the previous trial judge, thoroughly admonished defendant pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984). The court told defendant that it had the discretion to appoint standby counsel, but because the charges against him were straightforward and uncomplicated, it would not do so. Defendant indicated that he wished to proceed *pro se* with "assistance," and the court granted appointed counsel's motion for leave to withdraw.

¶ 12     The next court date proceeded via video conference. The trial court indicated that defendant was representing himself. Defendant objected, arguing that he did not "refuse [his] right to receive counsel." Defendant's uninterrupted argument spanned almost three pages of record. The trial court then asked him, "Do you want a lawyer? Yes or no?" Defendant responded, "All due respect, can you hear me out, please? You asking me a yes or no question, which I cannot just merely provide you with a yes or no response." The trial court passed the case. When the case was recalled, the court again asked defendant if he wanted a lawyer. Defendant did not answer the question but instead continued to argue that he should not have to be "silent throughout the entire course of these proceedings in effect to allow someone who [does] not know me [to] speak for me," but he did have the right to a lawyer to advise him. Defendant continued speaking, despite the trial court's warning that it was "close to just kicking [defendant] out of court." At the end of the proceedings, the court muted defendant.

¶ 13     At the following court date, the trial court inquired whether defendant wanted to plead guilty or go to trial. Defendant did not answer, but instead stated that he "needed counsel consistent with [his] interpretation of" the constitution. The court informed defendant that he had a right to a lawyer and a right to represent himself, but he did not "have a right to both of those. You cannot have a lawyer and represent yourself." Defendant would not give an answer and asked that the

court "hear me out." The court listened and interpreted defendant's remarks as invoking his right to counsel. The public defender was appointed as defendant's counsel.

¶ 14    Defendant responded that he did not want the public defender to represent him. He wanted "no one" to represent him. He did not want anyone, under any circumstance, to speak for him "[e]ver again." The court reiterated that defendant did not have the right to standby counsel and continued the case. Since defendant continued to argue, the trial court asked the sheriff to remove him from the courtroom.

¶ 15    At the next court date, the trial court determined that defendant was not requesting counsel, but he wanted standby counsel. When the court informed defendant that he did not have a constitutional right to standby counsel, he interrupted to disagree. The court warned defendant to "stop interrupting *** or we are going to do this trial here while you are in Cook County jail." The trial court muted defendant and continued the matter.

¶ 16    Defendant appeared in person on the following court date to view body camera video evidence. The trial court asked the parties if they were ready to set a trial date. Defendant stated that he was not ready because he had additional motions to file. The case was continued for six weeks to allow defendant to file his motions. Defendant subsequently filed motions and reviewed additional evidence. Defendant later withdrew those motions and filed new motions, including a motion to dismiss indictments.

¶ 17    At the hearing on the motion to dismiss indictments, defendant appeared in person. He presented a lengthy argument, spanning over 25 pages of record. The trial court denied his motion and inquired whether the parties were ready to set a trial date. The State answered in the affirmative. Defendant answered, "Can we have a trial[?] Take me up out of here, man. Have a trial with[out] me. I'm not participating in these proceedings no more unless you give me a record

so I can actually file my appeal to the Supreme Court." The trial court replied that defendant was not entitled to the record at this time. Also, "[t]he record will reflect that Mr. Fisher has left the courtroom. He does have the right to voluntarily waive his appearance and he has done so."

¶ 18 On the next court date, defendant again appeared in person. He repeated his arguments from the previous court date, which is spread over 14 pages of record. After hearing his argument, the trial court ruled that defendant's motion seeking dismissal of the charges "are again denied." When the court inquired whether the parties were ready for trial, defendant responded that he had "been asking and demanding a trial the first date [he] was incarcerated." He continued to interrupt and argue with the court as it tried to discuss a possible trial date with the prosecutor. The courtroom deputy told defendant to "[l]et [the judge] talk, and then you can talk." This exchange followed:

"DEFENDANT: I'm—you're not even a part of this courtroom. You just shut up talking to me, bro'.

THE COURT: Mr. Fisher, that's our sheriff—

DEFENDANT: Yes, and he dealing with security matters.

THE COURT: Our sheriff—

DEFENDANT: Security. I'm actually litigating, and he's undermining my ability to effectively bring—by talking to me period. I'm not his charge. He—you in charge of him. He not in charge of me.

THE COURT: He is in charge of safety and decorum in the courtroom—

DEFENDANT: Okay. Then you convey on the record to me what did I do to undermine anybody's respective safety in this position right now. Nothing. You can't say nothing. I haven't done anything, your Honor.

THE COURT: I didn't say that you are doing—

DEFENDANT: Okay. So why is he talking to me then? Deputies to deal with security. Stop talking to me then if it is not dealing with security.

THE COURT: Motion, State, 8-23-21, with [*sic*] for jury. See you then. Thank you.

DEFENDANT: And I respectfully note on the record again. I want to file a complaint and appeal directly to the Supreme Court because the decision you made was a matter of law, your Honor. It's a final order. You dismiss the charge—refuse to dismiss the charging instrument.

THE COURT: Mr. Sheriff, gentlemen, we are done with Mr. Fisher.

DEFENDANT: Don't call me back to this courtroom no more then, man.

THE COURT: Pardon me?

DEFENDANT: Don't call me back to the courtroom again until you give me the fu**ing—the documents that I need so I can actually file an official appeal to the Supreme Court. Do not call me back no more.

THE COURT: Thank you very much."

¶ 19    Defendant did not appear on August 23, 2021, and the matter was continued to August 26, 2021, with August 31, 2021, reserved for trial. Defendant did not appear via video conference for the proceedings on August 26, 2021, because he had not been brought out of disciplinary segregation. The case was continued to August 31, 2021, for a jury trial. The deputy stated that he would inform defendant of the trial date.

¶ 20                                B. *Jury Selection*

¶ 21    On August 31, 2021, the parties appeared in court. The trial court ordered the shackles removed from defendant. Although the State answered that it was ready for trial, the prosecutor

acknowledged that the State had three body camera videos defendant had yet to review. Defendant received this information and also received information from the State that its witness, his mother, had no recollection of the circumstances surrounding the incident. The court noted that the evidence benefitted defendant. Defendant asked to file a motion to dismiss based on insufficient evidence, which the trial court denied. Defendant continued to argue with the court, and it ordered him removed from the courtroom until presentation of a venire.

¶ 22    The case was recalled with defendant present in the courtroom. Defendant began arguing with the court about motions he wanted to file. The court advised defendant that the microphone was on, and the venire was entering the courtroom. Therefore, he should "wait until [he]s outside the presence of the jury to talk about those things." Defendant responded that he "had no problem with the jury hearing how you are infringing upon my ability to seek redress in this matter."

¶ 23    Defendant continued to argue as the venire was seated and sworn. Defendant stated that he was not ready for trial because he had not reviewed all of the State's evidence. The court asked defendant to refrain from comments until they were outside the presence of the jury. Defendant, however, responded that he was not ready for trial and was "actually seeking legal representation at this moment as well." The court reminded defendant that the case has been pending for over a year. Defendant continued his argument, spanning over four pages of record, without interruption. Defendant spoke to the jury even though the court told him, "stop, stop."

¶ 24    The record then reflected that defendant was removed from the courtroom. The court stated for the record that defendant "went on a continual rant, refused [the court's] physical signals to stop talking, and continued to talk, despite [the court's] efforts to get him to stop." Defendant was removed by sheriffs at the court's direction "because of his obstreperous and continued inappropriate manner."

¶ 25    Following introductory remarks to the venire, the trial court conducted *voir dire* in defendant's absence. The court excused one venireperson for cause, and the State exercised a preemptory challenge on one person who had two previous arrests. The remaining 12 panel members were accepted. Of those selected for the jury, seven had friends or family in law enforcement, and one juror was a Chicago police officer.

¶ 26    Outside the presence of the jury, the trial court noted that "[d]uring the entire time *voir dire* was being conducted by the court, Mr. Fisher continually pounded, in some manner, in the lockup and interrupted proceedings here to the extent [the court] was compelled to make a joke about construction." The court stated that defendant "forfeited *** his right to be present."

¶ 27    After excusing the jurors for lunch, the trial court contemplated having defendant in the courtroom for the selection of alternate jurors in the afternoon. First, the court had to ascertain whether defendant "would agree to comport himself in an appropriate manner." To make this determination, the court wanted him restrained in the courtroom due to his previous conduct. It noted that the jury would not be present to see him shackled. Defendant, however, refused to be shackled. In the court's view, defendant thus waived his right to be present in court for the afternoon session. The State had no objection.

¶ 28    On September 1, 2021, defendant appeared before the court. The trial court allowed him to file and present his additional motions and statement of facts. However, the court denied defendant's request to view the remaining body camera videos because defendant had already viewed numerous videos from cameras worn by police officers inside his mother's residence after the incident, and the remaining videos showed essentially the same thing. Defendant filed a motion for substitution of judge, which was presented to a different judge. That judge denied the motion, and the cause was returned to the trial court.

¶ 29                                   C. *Trial*

¶ 30    Defendant represented himself at trial. The State's first witness, Lillie Hawthorne, testified that defendant was her son. She stated that on August 6, 2020, defendant lived with her. She did not remember police officers coming to her home on that day, or whether she had a conversation with officers. She had suffered a stroke and did not "remember a lot of things." Ms. Hawthorne was asked to view People's Exhibit 1, which was a video recording of events that took place on August 6, 2020. She did not recognize the room shown on the video. When shown two other videos, Ms. Hawthorne stated that she could not remember the events depicted on the recordings.

¶ 31    Officers Zeyad Matlock, Shawn Bryant, and Taylor Van Amerongen also testified at the trial. They were dispatched to 6336 South May Street in Chicago, regarding a domestic incident with a firearm. There, they spoke with Ms. Hawthorne, who told them she had called the police. Officers activated their body cameras, which recorded their conversations with Ms. Hawthorne. The recordings were presented as People's Exhibit Nos. 1 through 4. The recordings showed that the officers encountered a broken mirror and vase in the foyer upon entering the apartment. Debris was strewn across the floor.

¶ 32    On the recording, Ms. Hawthorne told officers that defendant became irate after an argument. He stood beside her as she sat in a chair in the dining room. He threatened to shoot at a round "stand" near the foyer if she called the police. He then discharged his firearm towards the stand, and, according to Ms. Hawthorne, the bullet "hopped over" to the foyer. An expended shotgun shell was recovered from the front hallway of the apartment. Ms. Hawthorne told police that defendant went to the basement with the firearm. Officers searched the basement and recovered the weapon.

¶ 33 Ms. Hawthorne gave a description of defendant to police. Officer Van Amerongen observed defendant entering the alley behind Ms. Hawthorne's apartment. He matched the description given to police. Officers ordered defendant to stop, and they detained him.

¶ 34 Firearms analyst Mark Pomerance testified that he examined the recovered firearm, which he identified as a Mossberg Model 500A 12-gauge shotgun in working condition. He also examined the recovered shell to determine whether it was fired from the shotgun. Although the results were inconclusive, Pomerance clarified that the shotgun was the correct size to fire the recovered shell, but testing could not identify individual characteristics that would connect it to the shell.

¶ 35 The State presented certified copies of defendant's criminal convictions for aggravated discharge of a firearm and manufacture/delivery of 1 to 15 grams of cocaine as predicate offenses for the armed habitual criminal offense. People's Exhibits 1 through 5 and 7 through 14 were also admitted into evidence.

¶ 36 After the State rested, defendant moved for a directed finding, which the trial court denied. Defendant then testified in his own defense.

¶ 37 Defendant denied that he committed the offense and stated that he would never place his mother in danger. He testified that he was at work when the events occurred. He acknowledged having a criminal history and admitted that he was near his mother's residence on August 6, 2020, but only to smoke "weed" with some associates. Defendant stated that he was a drug dealer.

¶ 38 In closing, the prosecutor argued that Ms. Hawthorne had no motive to lie when she made the statements to police on the video recording. The prosecutor noted that when the shotgun discharged, it broke the mirror and damaged the plaster behind the glass. "That's what happens when you have a high velocity projectile from a firearm. That's what happens when it hits an object

like that. It shatters and it sprays everywhere." The prosecutor argued that by firing a shotgun in the apartment, "where there's flying glass going through the air, where there's broken glass on the ground," defendant endangered the bodily safety of Ms. Hawthorne, who was seated nearby.

¶ 39    Defendant argued that, in court, his mother "didn't make not one single utterance to you guys conveying you any degree of illegality of behavior that [he] was alleged to have exhibited on the day in question." She had suffered two strokes and exhibited an "inability to accurately remember the *** alleged events in question." Defendant argued that the State did not meet its burden to show that he "engaged in some form of illegality."

¶ 40    After deliberation, the jury found defendant guilty of being an armed habitual criminal and reckless discharge of a firearm.

¶ 41                                    D. *Posttrial and Sentencing*

¶ 42    On the date set for filing posttrial motions, defendant refused to appear in court. However, a public defender appeared on behalf of defendant and filed a motion for a new trial, a motion for judgment notwithstanding the verdict, and a supplemental motion for a new trial. Defendant subsequently filed a *pro se* motion for arrest of judgment.

¶ 43    On December 9, 2021, defendant and his counsel appeared in court for a hearing on the motions. After admonishing defendant, the trial court granted defendant's request to proceed *pro se*. However, the court denied defendant's request for more time to file posttrial motions and to find private counsel. The motions filed by the public defender were withdrawn, and defendant filed his motions for arrest of judgment. After hearing defendant's argument, the trial court denied his motions. Defendant responded, "Man, f*** you man. I'm done." The court noted for the record that "[t]his is not the first time Mr. Fisher has walked out of the courtroom while proceedings have been engaged." The court found that defendant waived his right to be present at the proceedings.

No. 1-21-1648

¶ 44    The trial court conducted the sentencing hearing, after which it sentenced defendant to 25 years' imprisonment for the armed habitual criminal conviction, with a concurrent three-year term for reckless discharge of a firearm. This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46    Defendant argues that the trial court violated his constitutional rights when it removed him from the courtroom during the jury selection process. He acknowledges that he did not preserve this issue below (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (requiring "[b]oth a trial objection and a written post-trial motion raising the issue" to preserve issues for review (emphases omitted))), but requests that we review his claim as plain error.

¶ 47    The plain-error rule allows a reviewing court to consider unpreserved claims of error under certain circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). We will review a claim as plain error where

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

However, we first must determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 48    Although both the United States and Illinois constitutions afford criminal defendants the general right to be present at all critical stages of trial proceedings, this right is not absolute. *People v. Lindsey*, 201 Ill. 2d 45, 55-56 (2002) (citing *Illinois v. Allen*, 397 U.S. 337, 342-43 (1970), and

- 15 -

*People v. Bean*, 137 Ill. 2d 65, 80 (1990)). Rather, a defendant has a constitutional right to be present at any critical stage of the proceedings if his or her presence would contribute to a fair proceeding as contemplated by the due process clause of the fourteenth amendment. *Id.* at 57 (citing *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). Similarly, under the Illinois Constitution, a defendant has a constitutional right to be present only when his or her absence would result in the denial of a substantial right in the proceeding, such as "the right to confront witnesses, the right to present a defense, and the right to an impartial jury." *Bean*, 137 Ill. 2d at 81. Although "courts must indulge every reasonable presumption against the loss of constitutional rights," a defendant may relinquish his or her right to be present by consent or misconduct. *Allen*, 397 U.S. at 343.

¶ 49    In *Allen*, the defendant refused court-appointed counsel and indicated his desire to represent himself. *Id.* at 338-39. After "considerable argument," the court allowed him to do so but asked court-appointed counsel to "sit in and protect the record *** insofar as possible." (Internal quotation marks omitted.) *Id.* at 339. During *voir dire*, the defendant conducted a lengthy examination of the potential jurors. When the trial court asked him to confine his questions to qualification matters, the defendant began to argue "in a most abusive and disrespectful manner." *Id.* As a last resort, the trial court asked appointed counsel to proceed with the questioning. The defendant stated that the attorney did not represent him and continued to speak. The court warned him that " '[o]ne more outbreak of that sort and I'll remove you from the courtroom' " (*id.* at 340) but the warning had no effect. After more rude remarks, the trial court removed the defendant, and a jury was selected in his absence. *Id.*

¶ 50    After a recess, but before the jury was brought into the courtroom, the defendant complained about his appointed attorney and requested to be present during trial. The court allowed defendant to remain in court as long as he "behaved" and did not interfere with the trial.

The jury entered and was seated, and appointed counsel moved to exclude certain witnesses from the courtroom. The defendant protested, threatening "to keep on talking all through the trial." (Internal quotation marks omitted.) *Id.* The trial court ordered him removed from the courtroom.

¶ 51 The defendant was absent while the State presented its case-in-chief, although he returned to court for identification purposes. During one appearance, he responded to the judge "with vile and abusive language." *Id.* at 341. After the State presented its case, the court allowed the defendant to remain in court for the remainder of the trial. *Id.* The defendant appealed his conviction, and the Illinois supreme court ruled that he had relinquished his right to be present by his conduct. *Id.* The federal court of appeals, however, reversed that determination. It held that " '[n]o conditions may be imposed on the absolute right of a criminal defendant to be present at all stages of the proceeding.' " *Id.* (quoting *United States ex rel. Allen v. State*, 413 F.2d 232, 235 (7th Cir. 1969)). The court concluded that a defendant should never be expelled from his own trial and the trial court's "ultimate remedy when faced with an obstreperous defendant like Allen who determines to make his trial impossible is to bind and gag him." *Id.* at 342.

¶ 52 The Supreme Court of the United States disagreed. While acknowledging the defendant's constitutional right to be present, it found that "[i]t would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes." *Id.* at 346. "[D]ignity, order, and decorum" in our court proceedings is "essential to the proper administration of criminal justice," and a "flagrant disregard" of standards of conduct should not be tolerated. *Id.* at 343. As such, the trial court must have sufficient discretion to maintain an appropriate atmosphere in the courtroom. *Id.*

¶ 53 The Court held that the defendant's removal from the proceedings was not constitutional error where the trial court repeatedly warned the defendant that he would be removed if he persisted in his unruly conduct, and the defendant continued his disruptive, disrespectful behavior so that the trial could not proceed with him in court. *Id.*

¶ 54 Citing *Allen*, the State argues that defendant in this case lost his right to be present in court during jury selection. As the State points out, the trial court regularly reprimanded defendant in pretrial proceedings for his obstreperous behavior and warned him that if he continued, he would be "kicked out of the courtroom," while the trial proceeded in his absence. Indeed, the trial court removed defendant on multiple occasions because he would not stop arguing with or interrupting the court. The State contends that defendant knew his misconduct in the presence of potential jurors would result in his removal, and therefore his absence was justified.

¶ 55 We agree that, similar to *Allen*, defendant's unrelenting argument and disrespect for the trial court during jury selection merited his removal. The defendant in *Allen*, however, had standby counsel representing him during his absence. This is a significant distinction from the case at bar, where defendant represented himself without standby counsel.

¶ 56 Defendant asserts that because he represented himself in the proceedings, his removal meant that no one was in court to represent the defense during jury selection. He argues that his absence as a *pro se* defendant therefore deprived him of his constitutional right to due process, including his right to be tried by an impartial jury. The question is whether defendant's absence from the courtroom, as a *pro se* litigant with no standby counsel, violated due process.

¶ 57 The due process clause "constitutionalizes the right in an adversary criminal trial to make a defense as we know it." *Faretta v. California*, 422 U.S. 806, 818 (1975). The sixth amendment, in turn, "grants to the accused personally" the right to make that defense. *Id.* at 819. As such, the

- 18 -

sixth amendment "implies a right of self-representation." *Id.* at 821. By conducting one's own defense, a *pro se* defendant "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Id.* at 835. Although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " *Id.* at 834 (quoting *Allen*, 397 U.S. at 350-51 (Brennan, J., concurring)).

¶ 58    Numerous courts in other jurisdictions have found that a *pro se* defendant's involuntary removal from court during trial proceedings, without anyone to represent him, necessarily has due process implications.[2]  See *United States v. Mack*, 362 F.3d 597, 602-03 (9th Cir. 2004) (*pro se* defendant's removal from court during trial resulted in a deprivation of counsel that amounted to structural error); *People v. Carroll*, 189 Cal. Rptr. 327, 331 (Ct. App. 1983) (*pro se* defendant's removal from the courtroom, without other defense counsel present, was "fundamental error requiring reversal without regard to prejudice"); *Commonwealth v. Tejada*, 188 A.3d 1288, 1294 (Pa. Super. Ct. 2018) (finding that although the *pro se* defendant was justifiably removed, his removal resulted in no opposition to the Commonwealth's case, "raising grave doubts as to the validity of the verdict"); *State v. Menefee*, 341 P.3d 229, 242-43 (Or. Ct. App. 2014) (finding that a trial cannot proceed upon the removal of a *pro se* defendant unless the court either secures the defendant's knowing waiver of his right to representation at trial or has taken another course of action that protects the defendant's right to representation); *People v. Cohn*, 160 P.3d 336, 344 (Colo. App. 2007) (finding that removal of the *pro se* defendant during jury selection gave "the

---

[2]Due to the absence of Illinois authority on this precise issue, we may look to other jurisdictions for persuasive authority. *Allstate Insurance Co. v. Lane*, 345 Ill. App. 3d 547, 552 (2003).

prosecution an unfair advantage in shaping the composition of the jury" that tried his case, and such constitutional error was inherently prejudicial and not harmless).

¶ 59   In all of these cases, the *pro se* defendants, like defendant here, engaged in obstructive and disrespectful conduct that justified their involuntary removal from the courtroom. Accordingly, they are distinguishable from cases where the *pro se* defendants knowingly and voluntarily absent themselves from the proceedings or explicitly refuse to engage in any defense of their case. See, for *e.g.*, *Torres v. United States*, 140 F.3d 392 (2d Cir. 1998) (the *pro se* defendant refused appointment of counsel and informed the court that, for political reasons, she would neither present a defense nor participate in the proceedings); *Clark v. Perez*, 510 F.3d 382 (2d Cir. 2008) (the *pro se* defendant, in furtherance of a political agenda, refused to attend *voir dire* or the presentation of the prosecution's case, leaving the defense table empty); *People v. Espinoza*, 373 P.3d 456 (Cal. 2016) (*pro se* defendant, who was not in custody and failed to appear in court after completion of *voir dire* and the first day of trial, knowingly and voluntarily absented himself from the remaining proceedings).

¶ 60   In *Torres*, *Clark*, and *Espinoza*, the reviewing court found that no constitutional error occurred when the trial continued without the presence of a defense. By proceeding in that manner, the trial court was simply respecting the defendant's sixth amendment right to defend him or herself. See *Torres*, 140 F.3d at 403; *Clark*, 510 F.3d at 397; *Espinoza*, 373 P.3d at 468. The defendants chose, through explicit words or clear action, to present no defense as their defense.

¶ 61   Unlike the defendants in *Torres*, *Clark*, and *Espinoza*, defendant in this case never manifested a desire to present no defense. Rather, the record shows that upon his return to the courtroom following jury selection, defendant avidly defended his case through cross-examination of the State's witnesses, testifying on his own behalf, and presenting an opening statement and

closing argument. We find this case more comparable to *Mack*, *Carroll*, *Tejada*, *Menefee*, and *Cohn*. As such, defendant's absence from jury selection completely deprived him of legal representation at a critical stage of trial. See *Bean*, 137 Ill. 2d at 84.

¶ 62 The State argues, however, that defendant knowingly waived his right to be present during jury selection where the trial court had warned him in the past that he would be removed from proceedings if he continued to misbehave, and he was removed for such behavior. The State further argues that any error resulting from defendant's removal was harmless, where there was no evidence the jury was biased or otherwise unfair.

¶ 63 A valid waiver of defendant's constitutional rights must reflect that he knew precisely what right he was relinquishing by continuing his misconduct, and what would happen if he relinquished that right. *Patterson v. Illinois*, 487 U.S. 285, 292 (1988). A *pro se* defendant undoubtedly possesses that knowledge if he or she explicitly makes a knowing and voluntary *choice* to continue without legal representation in the proceeding. As we explained, courts have honored that decision as part and parcel of the defendant's right to self-representation, even if that right is exercised to the defendant's detriment. It is another thing, however, to construe a *pro se* defendant's continued misconduct as a knowing waiver of his or her constitutional right to legal representation.

¶ 64 To find waiver under such circumstances, the trial court must be assured that the defendant was removed with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (Internal quotation marks omitted.) *Id*. At the very least, the court should explicitly warn the defendant that he will be removed if he continues to misbehave, which will leave him with no legal representation in the proceeding.

¶ 65 For example, in *State v. Lacey*, 431 P.3d 400 (Or. 2018), the trial court warned the defendant several times that if he continued his misconduct, he would be removed with no one to

represent him in court. The final warning occurred on the day prior to his removal. *Id.* at 403. The defendant was removed on the final day of trial, after the parties rested their cases and prior to the State's closing argument. *Id.* The Oregon Supreme Court held that by intentionally violating the trial court's orders, despite multiple and explicit warnings, the *pro se* defendant "made a knowing and voluntary choice to be removed and leave the defense table empty." *Id.* at 408.

¶ 66 In this case, defendant was never specifically warned that his removal would leave the defense table empty with no one to represent him. Moreover, although defendant received general removal warnings in past proceedings, he was not warned prior to his removal during jury selection. As a result, he did not have an opportunity to change his conduct in light of the warning and participate respectfully in those proceedings. See *United States v. Benabe*, 654 F.3d 753, 769-70 (7th Cir. 2011) (finding that a defendant's refusal to conform his conduct to the rules of the courtroom, despite opportunities to do so through warnings, can be evidence that he knowingly waived his right to be present in court for that proceeding).

¶ 67 More troubling, however, is the fact that defendant here was involuntarily removed during jury selection, which meant he was left with no legal representation for that procedure. Consequently, he had no say in the composition of the jury charged with deciding his case.

¶ 68 When a *pro se* defendant is involuntarily removed from court for misconduct, and no one is present to represent him, his constitutional right to due process is necessarily implicated. See *Davis v. Grant*, 532 F.3d 132, 143 (2d Cir. 2008) (finding that an absent defendant cannot protect his constitutionally guaranteed rights to confront witnesses against him, present his own witnesses, question potential jurors, or present a closing argument). An absent defendant without representation in a legal proceeding also poses a danger that the resulting lack of adversarial testing will undermine the accuracy of the truth-seeking process. *Id.* Furthermore, the judiciary has an

interest in "ensuring that criminal proceedings 'appear fair to all who observe them.' " *Id.* at 144 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)). As the court in *Davis* observed, "[w]e are hard-pressed to think of a circumstance more likely to make an observer question the fairness of a trial than the sight of an empty defense table." *Id.*

¶ 69    Given these fundamental constitutional concerns, a trial court should ensure that it either (1) has the knowing consent of the defendant to proceed in his absence or (2) provides a specific warning to the defendant with an opportunity to change his conduct, before it finds that a *pro se* defendant knowingly waived his right to any legal representation in the proceeding through his misconduct and subsequent removal.

¶ 70    Viewing the record as a whole, we find that defendant did not knowingly waive his right to legal representation when he was removed for misconduct during jury selection. We further find that proceeding with jury selection in defendant's absence, without any representation on his behalf, was a structural error not subject to harmless error analysis. See *Mack*, 362 F.3d at 603; *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) (reaffirming that the Supreme Court "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding"). Our supreme court has deemed jury selection a critical stage of trial.[3]  See *Bean*, 137 Ill. 2d at 84. Although defendant forfeited this issue on appeal, we review his claim as plain error under the second prong and reverse the judgment of the circuit court.

---

[3]The circumstances of defendant's removal in this case are distinguishable from that in *People v. Tatum*, 389 Ill. App. 3d 656, 667 (2009), a case cited by the State, where the *pro se* defendant was removed during the State's rebuttal closing argument, when "the trial was almost over."

¶ 71    To be clear, we do not condone defendant's behavior. Defendant's conduct before the court was incessantly disruptive, obstructive, and disrespectful, and the trial court did not err in removing him from the courtroom. However, while the trial court must have discretion to prevent a defendant's contumacious conduct from thwarting the orderly progress of a trial, it must also ensure that the trial proceeds in accordance with due process as guaranteed by the fourteenth amendment. See *Faretta*, 422 U.S. at 818 (noting that the fourteenth amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it").

¶ 72    To that end, we note that other options were available to the trial court in this difficult situation. The trial court could have appointed standby counsel to proceed on behalf of defendant during jury selection. See *Mack*, 362 F.3d at 601. In this case, however, where defendant persistently argued that he had a right to standby counsel to assist him, despite the trial court's rulings to the contrary, the court may have been hesitant to reward him with the precise outcome he sought through disruptive conduct.

¶ 73    Under the circumstances of this case, where defendant exhibited a persistent pattern of defiant, disruptive, and disrespectful conduct that threatened to thwart the proceedings, termination of his right to represent himself may have been appropriate. *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 76. The right to self-representation is not absolute and may be terminated if the defendant " 'deliberately engages in serious and obstructionist misconduct.' " *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (quoting *Faretta*, 422 U.S. at 834 n.46); see *Rainey*, 2019 IL App (1st) 160187, ¶ 75 (finding that misconduct justifying a defendant's exclusion from trial is the same type of misconduct "that would justify imposing counsel on an unwilling defendant"). Although not a perfect solution, terminating defendant's right to represent himself would have been constitutionally permissible.

¶ 74    Since we are remanding this case for a new trial, we must consider, for double jeopardy purposes, whether there was sufficient evidence to support defendant's convictions beyond a reasonable doubt. *People v. Brown*, 363 Ill. App. 3d 838, 850-51 (2005). When considering the sufficiency of the evidence, the relevant inquiry is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322 (2005). The jury, as the trier of fact, is responsible for resolving conflicts in testimony, weighing the evidence, and making reasonable inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35. Evidence that is insufficient to support a verdict is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 75    Defendant was convicted of being an armed habitual criminal. The State presented certified copies of defendant's criminal convictions for aggravated discharge of a firearm and manufacture/delivery of 1 to 15 grams of cocaine as predicate offenses for the armed habitual criminal offense. Defendant acknowledged his criminal history at trial, and he does not dispute the evidence supporting his armed habitual criminal conviction on appeal. We find that the jury could have found the essential elements of this offense beyond a reasonable doubt.

¶ 76    Defendant was also convicted of reckless discharge of a firearm. Pursuant to section 24-1.5(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.5(a) (West 2020)), a person commits the offense of reckless discharge of a firearm "by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." To prove defendant committed the offense, the State must show that he (1) recklessly discharged a firearm and (2) endangered the bodily safety of an individual. *People v. Collins*, 214 Ill. 2d 206, 212 (2005).

¶ 77    On appeal, defendant acknowledges that he fired the weapon and challenges only the evidence supporting the endangerment prong of the offense. He argues that although he fired the weapon in his mother's apartment while she was present, he directed the shot at a mirror in the foyer while she sat in the dining room. Defendant therefore contends that the jury's finding that he endangered the bodily safety of Ms. Hawthorne was improbable based on the evidence.

¶ 78    To endanger an individual's bodily safety in this context refers to conduct that potentially or possibly could result in injury rather than cause actual injury. *Collins*, 214 Ill. 2d at 214-15. The supreme court interpreted this provision as requiring the State to "establish that a defendant's reckless conduct created a dangerous situation—such that an individual was in peril of probable harm or loss." *Id.* at 215. In *Collins*, the supreme court found that the defendant's conduct of firing a weapon into the air placed individuals in the vicinity of the discharge in peril of probable harm or loss. *Id.* at 218. The court reasoned that "[t]he inherent danger caused by the reckless discharge of a firearm into the air, and the obvious ricochet effect that may occur when bullets fall to the ground, are matters of common sense." *Id.*

¶ 79    Here, defendant fired a weapon inside his mother's apartment while she was seated nearby. According to her statement on the video, defendant was irate and threatened to shoot a round stand near the foyer. When he fired the shot, the bullet "hopped" to the foyer. The bullet could have just as easily ricocheted off the stand towards Ms. Hawthorne. Furthermore, since they were in an enclosed environment, debris from objects struck by the gunshot potentially could have caused injury to anyone in the vicinity of the discharge. The jury's finding that defendant endangered the bodily safety of Ms. Hawthorne by firing the weapon inside her apartment was not so unreasonable, improbable, or unsatisfactory that there exists a reasonable doubt of his guilt.

¶ 80    Because a rational trier of fact could have found that the State proved all the elements of the offenses beyond a reasonable doubt, retrial will not violate double jeopardy principles. *People v. Drake*, 2019 IL 123734, ¶ 20.

¶ 81                                III. CONCLUSION

¶ 82    For the foregoing reasons, we reverse the judgment of the circuit court and remand for a new trial.

¶ 83    Reversed and remanded.

*People v. Turner*, 2024 IL App (1st) 211648

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-60112; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Matthew B. Chapman, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Daniel Piwowarczyk, and Gina Savini, Assistant State's Attorneys, of counsel), for the People. |