2025 IL App (4th) 240514
NO. 4-24-0514
IN THE APPELLATE COURT
FOURTH DISTRICT

FILED
November 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| STEVEN HUGHES, | ) | No. 23CF253 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice DeArmond concurred in the judgment and opinion.
Justice Doherty specially concurred, with opinion.

**OPINION**

¶ 1 In July 2023, the State charged defendant, Steven Hughes, with aggravated battery, a Class 3 felony (720 ILCS 5/12-3.05(c) (West 2022)), alleging that he struck Jenna Berry while in a place of public accommodation. At his first appearance, defendant waived his right to counsel and elected to proceed *pro se*.

¶ 2 In January 2024, the trial court conducted defendant's jury trial, during which the court twice ordered defendant removed for inappropriate behavior after the court specifically admonished him that he would be deemed to have waived his right to be present if he did not conduct himself properly. The jury found defendant guilty of aggravated battery, and the court later sentenced him to 10 years in prison.

¶ 3 Defendant appeals, arguing that the trial court erred by (1) failing to specifically

admonish him that if he were removed from the courtroom, he would be completely unrepresented for those portions of the proceedings or (2) in the absence of such a specific warning, failing to appoint standby counsel to represent defendant after he waived his right to be present at trial by his misconduct. Defendant acknowledges he failed to raise the issue in the trial court but argues the court committed second-prong plain error.

¶ 4        We disagree and affirm.

¶ 5                          I. BACKGROUND

¶ 6                    A. The Charges Against Defendant

¶ 7        In July 2023, the State charged defendant by indictment in two separate cases that proceeded together in the trial court.

¶ 8                          1. *Case No. 23-CF-253*

¶ 9        In case No. 23-CF-253, the case at issue in this appeal, the State charged defendant with (1) one count of aggravated battery to Berry (*id.*) and (2) one count of unlawful possession of a weapon by a person in the custody of the Illinois Department of Corrections (DOC) (*id.* § 24-1.1(b)). The indictment alleged that on February 13, 2023, defendant knowingly (1) struck Berry while she was in a public place of accommodation (a hospital) and (2) possessed a homemade shank while confined in Pontiac Correctional Center. (We note that the State later dismissed count II and amended count I to allege that the offense occurred on March 29, 2023.)

¶ 10                        2. *Case No. 23-CF-252*

¶ 11       In case No. 23-CF-252, the State charged defendant with (1) one count of aggravated battery of Kyle Ehmen (*id.* § 12-3.05(d)(4)(i)) and (2) one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). This indictment alleged that on February 13, 2023, defendant (1) battered Ehmen, knowing him to be a correctional institution employee

- 2 -

engaged in the performance of his authorized duties, and (2) possessed a weapon, having previously been convicted of a felony.

¶ 12                  B. Pretrial Matters

¶ 13                  1. *The Arraignment Hearing*

¶ 14       In November 2023, the trial court conducted defendant's arraignment hearing, at which it informed defendant of his right to counsel and asked whether he wanted an attorney appointed for him. Defendant requested to proceed *pro se*. The court questioned him to determine whether he was knowingly, intelligently, and voluntarily waiving his right to counsel. Regarding defendant's prior litigation experience, defendant stated that he had represented himself in his prior criminal jury trial—at which he was convicted of attempt (murder) and armed robbery—with the assistance of standby counsel.

¶ 15       The trial court then admonished defendant regarding his decision to represent himself pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) and also did so consistently with this court's suggestions in *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82 (1991). Relevant to this appeal, the court specifically told defendant he would not receive (1) special consideration from the court, (2) extra time for preparation, or (3) greater library time. When asked if he understood, defendant answered, "Absolutely."

¶ 16       Regarding standby counsel, the following exchange occurred:

> "Also, it is within my discretion to determine whether to appoint standby counsel. I understand you had standby counsel in the past, but it's unlikely that you would get standby counsel in this case. Considering the nature and gravity of the charges, the expected factual and legal complexities and your abilities and experience, I am not going to be appointing standby counsel in this case.

THE DEFENDANT: Um-hum.

THE COURT: So you would not have standby counsel.

Any questions about any of that?

THE DEFENDANT: No, ma'am.

THE COURT: All right. And you understand all of these issues?

THE DEFENDANT: Yes, ma'am.

THE COURT: And knowing that, you still wish to represent yourself?

THE DEFENDANT: Yes, ma'am."

The court then accepted defendant's waiver of counsel.

¶ 17        The trial court then formally read the charges, and defendant pleaded not guilty. Defendant made an oral demand for a speedy trial, and the court set the case for a jury trial in January 2024.

¶ 18                                2. *The Final Pretrial Hearing*

¶ 19        In December 2023, the trial court conducted a final pretrial hearing, and both parties stated they were ready to proceed to trial. Defendant also filed a motion to dismiss the charges. The court proposed it could hear arguments and rule on defendant's motion to dismiss on the morning of the first day of trial, and defendant consented to that procedure.

¶ 20        Defendant mentioned some witnesses, and the trial court asked if he was planning on subpoenaing witnesses. Defendant stated that he wanted to and asked how he could do that. The court responded that it could not help defendant conduct his defense and said defendant should go through the circuit clerk's office. The court set the jury trial for January 10, 2024, and stated it would hear defendant's motion to dismiss before jury selection. The court asked defendant about his witnesses and offered to grant him a continuance to prepare for trial. Defendant declined,

stating, "I want to do this immediately."

¶ 21                              3. *The Motion To Dismiss Hearing*

¶ 22        In January 2024, on the morning of defendant's scheduled jury trial, the trial court conducted a hearing on defendant's motion to dismiss. At the beginning of the hearing, the State explained that it was seeking a continuance in case No. 23-CF-252, the case alleging aggravated battery against Ehmen, due to his unavailability. However, the State answered ready for trial in case No. 23-CF-253, the case alleging aggravated battery against Berry. Defendant answered ready for trial in both cases.

¶ 23        The trial court explained to defendant, "Now, we're not going to trial on both cases today, that's practically impossible. We can only do one. I think I indicated we would do one this calendar and one the next calendar. So, the State is indicating they're ready on 253." The court stated it would proceed to a hearing on defendant's motion to dismiss both cases and, if necessary, proceed to trial in case No. 23-CF-253.

¶ 24        The trial court then heard defendant's argument on his motion to dismiss. Defendant argued that he was indicted in case No. 23-CF-253 for assaulting Berry and possessing a weapon while in the custody of the DOC, both allegedly having occurred on February 13, 2023. However, defendant stated that he was in prison on February 13, 2023, and could not have committed the offense at the hospital on that date. Defendant explained that the State originally charged him by information in case No. 23-CF-152, alleging he committed aggravated battery against Berry on March 29, 2023, in that he "pushed" her.

¶ 25        Defendant further argued the State lied to the grand jury when it obtained the current indictment because the indictment alleged the offense occurred on February 13, 2023. Defendant also argued that the charges were the result of administrative disciplinary proceedings

- 5 -

related to these incidents but the records in those administrative proceedings had been expunged because the correctional officers made false statements in their reports about those incidents.

¶ 26   Defendant argued that "it never happened" as the State alleged, the State lied to the grand jury to obtain the indictment, and the disciplinary records on which the charges were based had been expunged.

¶ 27   In response, the State explained that the indictment in case No. 23-CF-253 incorrectly listed the date of the offense as occurring in February but the police report showed the offense actually occurred on March 29, 2023.

¶ 28   The trial court denied defendant's motion to dismiss. As the court tried to explain its ruling, defendant interrupted the court six times, at which point the court stated, "You're obviously not going to let me explain my ruling very well. So, motion to dismiss denied." During its explanation, the court repeatedly admonished defendant not to interrupt and explained that his grounds for dismissal constituted defenses for trial and did not fall within the legal grounds for dismissal provided by statute. The court took a recess to wait for the potential jurors to arrive.

¶ 29   4. *Final Admonitions and Pretrial Discussion*

¶ 30   When the trial court recalled the case, it again read the indictment and noted that case No. 23-CF-253 had two counts, both allegedly occurring on February 13, 2023, and one of the counts was a weapons charge. The court stated it did not realize the case had a second count.

¶ 31   The State moved to amend the indictment to correct the date of the offense. The State alleged that the indictment contained a scrivener's error and moved to correct the error by changing the date of the offense to March 29, 2023. The State represented that the testimony presented to the grand jury stated the date of the offense was March 29, 2023. Regarding the weapons charge, the State moved to dismiss the charge because it "was appropriately in the 252

case, not in the 253 case."

¶ 32       After granting the State's dismissal of the weapons charge, the trial court realized that, based on these changes, it previously had improperly admonished defendant of the potential penalties he faced. The court readmonished defendant of the potential penalties he faced and, in light of that discussion, again reviewed the plea negotiations and offer from the State. During this process, the court asked defendant not to interrupt and, when defendant continued to do so, asked, "Do you want to stay in this courtroom?" Defendant said, "Yes, ma'am," and the court again admonished him not to interrupt.

¶ 33       The trial court continued to discuss the offer from the State and whether defendant would be willing to conduct plea negotiations because he was facing a very long sentence that would prevent him from ever being released from prison. Defendant insisted that he did not commit any the offenses and did not hit Berry, although he stated he pushed her. Defendant said (1) he was not going to plead guilty and (2) if he was going to be sentenced to further time in prison, it would only be after his being convicted at trial. The court continued to encourage defendant to negotiate with the State and noted that defendant had essentially admitted committing aggravated battery by admitting he shoved the nurse, although the court acknowledged that defendant had an argument that his actions were not a battery.

¶ 34       During this discussion, defendant frequently interrupted and talked over the trial court, despite repeated requests to stop doing so. Defendant clarified that he merely pushed the nurse's hand. Defendant then repeatedly stated he "need[ed] to go through jury trial" and was ready to go to trial. The following exchange occurred:

>      "THE DEFENDANT:—I want to go to the jury. On record, I'm ready for the jury trial.

THE COURT: So, here's what's going to happen. I have got the jurors here.

THE DEFENDANT: Let's do it.

THE COURT: The jurors are going to be brought into the back of the courtroom, okay, and I am going to give them a few comments about the charges today, which is just Count 1, you dismissed Count 2, right,—

MR. O'BRIEN [(THE PROSECUTOR)]: Yes, [Y]our Honor.

THE COURT:—it was put in both. I am going to allow the State to amend the date of the indictment based upon—

THE DEFENDANT: You—

THE COURT: Excuse me.

THE DEFENDANT: That's the, anything you doing, you sound racist to me. Everything you're doing is illegal.

THE COURT: Oh, Mr. Hughes, don't go down that road.

THE DEFENDANT: Everything you—

THE COURT: All right. I am directing the court reporter to take up what I'm saying only. Mr. Hughes, if you interrupt me during the trial, I am not going to be able to have you in here. I am not going to have you going off like that in front of the jury when I'm speaking. All right. I decide whether it's legal or not."

¶ 35    The trial court explained that it was legal to amend an indictment to conform its language to the evidence presented to the grand jury. Defendant then offered to show the grand jury transcript to the court, and the court reviewed the transcript. The transcript confirmed that the prosecutor told the grand jury that the events occurred on February 13, 2023, but the police officer witness testified that the offense occurred on March 29, 2023.

¶ 36        The trial court then mentioned again that defendant had admitted the elements of the offense to the court and he was risking a guilty verdict rather than accepting the State's offer to plead guilty in exchange for the dismissal of the other case. The court sought to ensure that defendant wanted to go to trial and reject the State's plea offer despite all of this, and defendant stated he did. The following exchange then occurred:

"THE COURT: All right. Well, you understand that you're not going to be interrupting when the jury is in here.

THE DEFENDANT: Pardon me?

THE COURT: You cannot interrupt when the jury is in here.

THE DEFENDANT: All I'm going to do is just speak to the jury—

THE COURT: Okay.

THE DEFENDANT:—tell the jury my story.

THE COURT: Well, remember that you're not just going to be able to stand up and tell your story like we've been talking in here on your motion. You're going to have to follow the rules of evidence, bring in your witnesses or you can testify.

THE DEFENDANT: Well, one, I wasn't allowed to get no witnesses.

* * *

THE COURT: *** Do you want to continue this to get your witnesses here?

***

THE DEFENDANT: No, let's go on and get it over with today.

THE COURT: Do you want a chance to get your witnesses?

THE DEFENDANT: I want to get it over with today.

THE COURT: Well, you know it's not going to be over with today, because

you're going to have to come back on the other case and if you're found—

THE DEFENDANT: We can get one of the cases over with today.

\* \* \*

THE COURT: \*\*\* I just want to make sure you understand that if you want your witnesses here, I will give you time to get them here. But if we go forward without them, you're not going to be able to say I didn't allow you to get your witnesses here. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: And you want to go forward without your witnesses?

THE DEFENDANT: Yes, ma'am."

¶ 37 Following this exchange, the trial court offered several more times to continue the case to allow defendant to subpoena various witnesses, but defendant declined. The court also offered to continue the case due to the State's amendment of the date of the offense in the indictment, but defendant declined and insisted on proceeding to trial.

¶ 38 Defendant then stated he wanted to make a "confession" to the trial court. The court refused to hear the confession but took a recess to allow defendant to speak with the State to see if the "confession" could lead to further plea negotiations. After the recess, defendant confirmed that the plea negotiations were "not fruitful" and he was ready to proceed to trial.

¶ 39 C. The Jury Trial

¶ 40 Later that morning, the trial court conducted defendant's jury trial.

¶ 41 1. *Jury Selection*

¶ 42 The trial court then brought in the potential jurors and began jury selection. The court asked preliminary questions, during which one potential juror indicated that he had worked

with one of the State's witnesses, Officer Robin Bohm, "for years" but had not maintained regular contact with him. That potential juror indicated that he believed he could judge the officer's testimony fairly and the same as any other witness and could be a fair and impartial juror.

¶ 43 After the trial court's questions, the State asked a few general questions of the jurors, and defendant asked one question—namely, whether the all-white jury could "honestly, God, in the name of God, be fair and impartial and jurors according to the evidence" when defendant was an African American. The jurors indicated they could be fair and impartial.

¶ 44 The trial court explained the jury selection procedure and that it was required by law to use that procedure. The State exercised a peremptory challenge on one juror and then tendered the panel to defendant. Defendant stated he wished to strike the "police officer," meaning the potential juror who stated he had worked with Bohm. The court explained to defendant that potential juror was not in the panel being discussed and he would be addressed later. (We note that the court later, after the jury had been selected and sworn, stated on the record in response to a comment from defendant that the potential juror was not, in fact, a police officer.)

¶ 45 Defendant expressed dissatisfaction with all of the jurors because none of them was black. After being repeatedly prompted by the trial court to focus on the jurors in the current panel, defendant struck the first six potential jurors, which the court explained left him with one peremptory challenge remaining. Defendant again voiced his belief that the process was "racist" and unfair. Defendant then said he was "waiving everything" and "waiving picking on the jury."

¶ 46 The trial court accepted the first panel of four jurors and then proceeded to the next panel, which contained the potential juror about which defendant had previously complained. When the court asked defendant if he accepted that panel, defendant responded, "Y'all on some racist stuff. Whatever you decide in this racist courtroom, that's what we're going with." The court

- 11 -

took his answer as an acceptance of the second panel and asked about the third.

¶ 47 At this point, defendant said, "I told you earlier that there's something weighing on my mind that I need to confess." The trial court told defendant to "hold on" because it did not "want any of this brought up in front of the jury." The court excused the selected and potential jurors from the courtroom and allowed defendant to address the court.

¶ 48 Defendant confessed to committing, with two accomplices, a double homicide of a woman and her child in Chicago in 1995. Defendant provided details such as names and locations and expressed a desire for the family to have closure and ease his own conscience. Defendant also confessed to making a death threat against President Joe Biden.

¶ 49 The trial court stated it could pass the information on to law enforcement for investigation but it had to deal with the case in front of it and asked what defendant wanted to do. Defendant stated he wanted to continue with the trial. Defendant then reiterated that he felt the process was racist and he was at a disadvantage because the jurors were all white, lived in a small community, and all knew each other.

¶ 50 Defendant asked for a change of venue, which the trial court denied. Defendant then asked for a change of judge due to bias, complaining that the court was allowing the prosecutor to engage in misconduct. The court denied the motion for substitution of judge and told defendant he needed to stop interrupting and to answer its questions.

¶ 51 The trial court then called in the remaining potential jurors and resumed jury selection. When it was defendant's opportunity to ask questions, the following exchange occurred:

"THE DEFENDANT: The question is this: If a person threatened the President of the United States with a death threat,—

THE COURT: Mr. Hughes, Mr. Hughes,—

THE DEFENDANT:—do you believe they should be prosecuted? Do you believe—

THE COURT: Mr. Hughes,—

THE DEFENDANT:—the President should be informed of what they did?

THE COURT:—do you want to be taken out of here?

THE DEFENDANT: That's all I wanted to ask the jury.

THE COURT: That is not relevant, you know you cannot ask that question. Do you have any other questions?

THE DEFENDANT: No. I want to ask that question because that's what I did. I made a—

THE COURT: All right. We're not talking—

THE DEFENDANT:—death threat against the President.

THE COURT:—about that. I told you we're not talking about that. All right. Any other, besides asking them about that, any questions pertaining to this case, Mr. Hughes?

THE DEFENDANT: I feel—

THE COURT: I don't want to know how you feel; I want to know if you have questions.

THE DEFENDANT: No question is based on racism.

THE COURT: No questions based on racism?

THE DEFENDANT: Based on racism.

THE COURT: Okay.

THE DEFENDANT: Based on racism.

THE COURT: Okay.

THE DEFENDANT: Ain't nobody—

THE COURT: All right. That's all I need to hear.

THE DEFENDANT:—African-American up there.

THE COURT: I'm muting you.

All right. So, what we're going to do is select from this particular group. We still have three from the last group; I will allow backstriking.

Mr. O'Brien ([the prosecutor)], [the fourth panel] to you.

MR. O'BRIEN: Accept and tender the panel, [Y]our Honor.

THE COURT: All right. Mr. Hughes, you have one peremptory challenge left. Do you want to use it? Is that a yes or a no?

THE DEFENDANT: No.

THE COURT: No? Okay. You accept this panel?

THE DEFENDANT: Look, it's unfair.

THE COURT: All right. We'll get into that outside the presence of the jury.

THE DEFENDANT: I'm at a disadvantage.

THE COURT: Sir, you're intentionally being difficult."

¶ 52    The trial court selected the fourth panel and one alternate. The court then excused the venire and informed the parties of its planned course of action. The following colloquy between defendant and the court then occurred:

"THE COURT: Mr. Hughes, I do want the record to reflect that all morning long you were pretty, even though you were, had a lot to say, windy is the word I'm looking for, you were on point; and when the jury comes in here and you start

- 14 -

getting off point, and I think that's an intentional act on your part—

THE DEFENDANT: I mean, I—

THE COURT: Sir, you're interrupting me; you have to stop interrupting me.

THE DEFENDANT: Yes, ma'am.

THE COURT: All right. You can make your arguments to me outside the presence of the jury; but when the jury's in here and you start talking about confessions that you made and being held responsible for threatening to shoot the President of the United States, I think that's intentional on your part to try to get this jury thrown out so that you can buy yourself more time for reasons I don't know because you actually want the trial to go forward. So, you're just, you're throwing issues in here that don't need to be in here that are inappropriate; and I think you're doing that intentionally.

THE DEFENDANT: No, I'm not doing that intentionally. Can I respond to what you said?

THE COURT: You can respond in a moment,—

THE DEFENDANT: Yes, ma'am.

THE COURT:—in a moment, because when the jurors are ready we're bringing the jurors in. I just want the record to reflect that for the whole entire morning you were on point and lucid with your arguments. And then I bring the jury in here, and you're going all the way off into left field.

THE DEFENDANT: Okay. Now, let me respond. I'm not doing anything to stop the jury from going on. I said what I said just to make a point. You are

putting me on trial for this, but I confessed, and this is in my civil litigation, to being involved in a homicidal murder. Then not only that,—

THE COURT: Yeah, that will be addressed, don't worry.

THE DEFENDANT: And then I made a death threat against the President back in August of 2021, and it was never reported. People's violated federal laws and regulations.

THE COURT: Sir, you already said that. I understand that. Okay? But let it go now. This jury doesn't know anything about it. They don't have anything to do with it. Okay? I said I would report it to the authorities, and I will. Whatever happens from there we'll take it up there. But I still have a trial on a charge of aggravated battery that I am required to deal with, and you seem to be focused on something else all of the sudden once the jury starts. Before the jury was in here, everything was fine. So, I don't want to hear anything else from you right now, the jury is going to be brought in here in a moment, and I don't want you to be in the middle of speaking when they're brought in.

THE DEFENDANT: Okay. Well, can I say this to the jury?

THE COURT: No. No.

THE DEFENDANT: I can't say nothing to the jury.

THE COURT: Not right now, no. All I'm going to do is bring them in here, swear them in, and then they're going to leave, that's all we're doing. Then I'm going to let them eat because it's a quarter till 1:00. And after they eat, then we're going to start the trial. The trial is not an opportunity for you to stand up and say whatever you want. You can do an opening statement that relates to the charges,

you can ask the witnesses questions, and you can do a closing argument that relates to the evidence that was presented. That's it. Whatever spiel you want to make about threatening the President, they don't need to hear. And I don't want to hear anything else right now; so, just let me just get them in here."

¶ 53     The trial court then swore in the jury and excused them for lunch.

¶ 54     After lunch, the parties gave their opening statements. Defendant's opening statement was short but appropriate, and he stated he would introduce evidence to show that the officers' testimony was not true and defendant was innocent.

¶ 55                    2. *The State's Case*

¶ 56                    a. Douglas Williams

¶ 57     Douglas Williams testified that he was a correctional officer with the DOC in Pontiac, Illinois. On March 29, 2023, Williams and another officer took defendant to a hospital for an ultrasound. Defendant had difficulty walking and used a wheelchair. The officers took defendant to the ultrasound room, helped him up onto the examination table where he laid down, and the ultrasound tech began her examination.

¶ 58     Williams testified that during the ultrasound, without warning or explanation, defendant sat up and forcefully punched the ultrasound tech, Berry, in the head with his left hand. Williams and the other correctional officer restrained defendant, and the ultrasound tech left the room. Thereafter, the officers returned defendant to the prison.

¶ 59     On cross-examination, defendant attempted to ask Williams questions about the administrative actions that resulted in defendant's punishment by DOC based on the ultrasound visit. The trial court sustained several foundation objections because defendant could not establish that Williams knew about the reports or documents defendant was trying to introduce. The court

also sustained several objections when defendant attempted to ask lengthy, compound questions about these details that amounted to an attempt to testify. Defendant frequently interrupted the court and the State when they were speaking. Defendant also asked questions in which he suggested that the officers assaulted and beat him after the incident and that the administrative discipline was expunged due to their being fraudulent. The State's objections to defendant's remarks were sustained.

¶ 60                                  b. Jenna Berry

¶ 61         Jenna Berry testified that she was an ultrasound tech at OSF Saint James–John W. Albrecht Medical Center in Pontiac and had been for the past 11 years. In March 2023, she conducted an ultrasound on defendant. Berry described the room and said that defendant arrived with two guards from the prison and hospital security was also present. Defendant was lifted up onto the bed; Berry explained the test to him and then began the exam. Berry testified that defendant "was asking some questions, just basic, what are you looking at; and I was just in the middle of doing his scan and he punched me in the right side of my face." Berry stated there was no warning, defendant did not say anything, make any noise, give an indication of pain, or express any anger prior to punching her.

¶ 62         Berry testified that she did not see the punch but it felt like a closed fist and was very painful. Defendant was removed from the hospital, and she did not finish the examination. Later, she spoke with a police officer, who photographed her face to document the injuries. The State asked that the trial court to admit the photo of her injuries into evidence, and defendant objected.

¶ 63                  i. *Defendant's Removal From the Courtroom*

¶ 64         The following exchange occurred:

"THE DEFENDANT: I'm objecting to any exhibits until I question the witness after you. And then—

THE COURT: Okay. I understand your objection. Subject to cross, I'll allow it. So, you can ask questions about it.

MR. O'BRIEN: May I approach the witness, [Y]our Honor?

THE COURT: You may.

THE DEFENDANT: Your Honor, why is you—This, this, this—

THE COURT: Mr. Hughes, the ruling is that he may address the witness with the exhibit. He's laid the foundation for the exhibit.

THE DEFENDANT: That's bias.

THE COURT: All right. I'd like the jury excused from the courtroom please. Please do not talk about anything you've heard in here so far.

(Interruption.)

THE DEFENDANT: He's suggesting to the witness, [Y]our Honor.

THE COURT: Can you wait? Please wait.

(The following proceedings were had outside the presence and hearing of the jury.)

THE DEFENDANT: He's suggesting to the witness. He's telling the witness I want you, he's showing the witness something that he wants the witness to testify to, and you're allowing it to happen, you're allowing it to happen.

THE COURT: Ms. Berry, you can leave the courtroom for now.

(Interruption.)

THE COURT: I want the record to reflect that the defendant was yelling at

me—

THE DEFENDANT: No, I—

THE COURT:—and screamed very loudly—

THE DEFENDANT: Okay.

THE COURT: Excuse me, sir. You cannot keep interrupting me. I am being very patient with you today, and I want the record to show that you were yelling at me. You raised your voice very loud, yelling that it was bias, yelling about the evidence; and I still had the jury in here, and you are yelling at me. That is not appropriate. I told you and told you, there are rules of evidence. When you said you wanted to go *pro se*, I told you there are rules of evidence. You don't understand the rules of evidence at all. You are not doing it properly, you didn't have the foundation. He's got the foundation, he tendered it properly. For you to erupt like that in front of the jury is, first of all, not smart; but, second of all, I'm going to hold you in contempt of court if it continues. You can't yell at me in front of the jury. Period. You can't say it's not fair in front of the jury. You lay your record, I've given you ample opportunity to present your evidence and your case; but it is inappropriate for you to make those types of comments in front of the jury, and I'm not going to allow it. And if you keep doing that, you're not going to be in here for the rest of the trial. You're going to have effectively waived your right to be present. You cannot raise your voice, you cannot interrupt Mr. O'Brien. You can ask questions, but you can't question my rulings. All right? I'm following the rules of evidence; I'm sorry you don't understand the rules of evidence. You chose to represent yourself. I told you you were going to have to follow the rules of evidence,

and you're not following the rules of evidence. I'm going to bring that jury back in here. I don't want any more outbursts. If you have an objection, you say objection, that's it. You don't go yelling about racism and bias.

THE DEFENDANT: My objections ain't no good.

THE COURT: Well, you know what, that's because they don't have a sound basis in the law.

THE DEFENDANT: One, well, under the law, you aren't supposed to hold me to the standards of an attorney who passed bar; and then I'm supposed to have legal assistance, what you call assisting me if I'm *pro se*. I'm supposed to have what you call counsel, co-counsel with me; and you denied me that. And then I tell you I can't do no law research, I can't prepare—

THE COURT: Listen, we're in the middle of a trial. These—

THE DEFENDANT:—no motions if I don't have no access to the law library.

THE COURT: These issues were already addressed pre-trial.

THE DEFENDANT: Right. And you said I'm not going to make no special provision for you to utilize the law library; that's a due-process violation. And then you're going to allow him to take a photograph, you know what I'm saying, to show to the witness, you know what I'm saying; and then he'll started saying, when this alleged assault, you know what I'm saying, one,—

THE COURT: All right, that's enough. I'm not arguing with you. That is enough. I don't want to hear any more. When I rule on something, it is the ruling, you don't get to question my ruling.

THE DEFENDANT: Yeah, I see that.

THE COURT: Period. So, I'm going to bring the jury back in here, we're going to get Ms. Berry back on the stand, and you're going to follow the rules. The rules for this procedure are, if you have an objection, you simply say, objection; I'll ask you what the objection is. But do not argue with me or argue over my rulings. Do you understand that?

THE DEFENDANT: Yes, ma'am."

¶ 65 Immediately upon the jury's reentering the courtroom, defendant asked if he could "just please say one thing," to which the trial court said, "No." Defendant began to argue with the court, leading to the following exchange:

"THE COURT: No. Mr. Hughes, the jury has been brought back into the courtroom. And I want it noted that the defendant started raising his hand while the jury was being brought in, not during the period of time that we waited for the bailiffs to get the jury. So, the jury is now present. I ruled on the objection. The objection is overruled.

Mr. O'Brien, you may approach the witness with your picture.

MR. O'BRIEN: Thank you, [Y]our Honor.

THE DEFENDANT: This is racism.

DIRECT EXAMINATION (Cont.)

BY MR. O'BRIEN:

Q. Ms. Berry, I'm going to hand to you what's previously been marked as People's No. 1.

THE DEFENDANT: That's dirty, shitty rules.

THE COURT: All right. Out of here. Take him out. Take him out."

¶ 66                    ii. *Berry's Remaining Testimony*

¶ 67       Once defendant was removed from the courtroom, the State continued its examination of Berry. The State laid the foundation for the admission of the photo, which the trial court admitted, and then asked Berry if she continued to work that day. Berry testified that she did not return to work that day and had to take the rest of the week off to address her mental health.

¶ 68                    c. Officer Robin Bohm

¶ 69       While defendant was still not present in the courtroom, the State called Officer Robin Bohm, who testified he was a "patrolman" for the police department and had been for the last 22 years. On March 29, 2023, he responded to a call of a disturbance at the hospital.

¶ 70       On direct examination, the following exchange occurred:

"Q. Okay. What did you learn when you got there?

A. I met with a lead ultrasound tech; her name is Jenna Berry, and she advised that a—

THE COURT: Hold on. I'm not going to allow hearsay to come in, Mr. O'Brien; so,—

MR. O'BRIEN: Yes, [Y]our Honor."

¶ 71       Bohm testified that he spoke with correctional officers and wrote a report. He further testified that because the hospital was open to the public, it was a place of public accommodation.

¶ 72       The State then rested.

¶ 73                    3. *Defendant's Case*

¶ 74                    a. Defendant's Return to the Courtroom

¶ 75    The trial court ordered defendant to be returned to the courtroom "fully restrained." The following exchange then occurred:

"THE COURT: The jury was out—So, the defendant is now in here, but the jury is out. The jury was out, we had a discussion because Mr. Hughes felt that the objections were not being fairly ruled upon, which was inaccurate. I, in fact, was ruling correctly. In any event, we had the discussion; Mr. Hughes, I was very clear to not engage in that type of disruptive behavior and he remained quiet and calm and said he understood me. Then we brought in the nurse, the witness back on the stand, or the tech, pardon me, back on the stand, and that took a few moments. And then once she was in, I said to get the jurors, the bailiff stepped out to get the jurors. So, maybe we had a minute to minute and a half. During that time, Mr. Hughes sat there in his chair, said nothing, was not reacting in any way, he seemed perfectly fine, until the jurors started filing in. When the jurors started filing in, he started raising his hand up high, straight-armed, pointing his finger in the air. I told him to wait until the jurors were in here. And the jurors were in here, I said we were proceeding; and once the line of questioning started, the defendant started making comments. I believe the court reporter might have gotten some of them. The first thing he said, this was racist and threw his hands up in the air. So, he became loud then at that point, very angry tone, throwing his hands up, agitated; and I became very concerned for the safety of the people in the courtroom and particularly for the sanctity of the proceeding. The defendant was yelling, I don't know, I don't know, I think the court reporter got what she could, but he was yelling very loudly as he was taken out of the courtroom by the transport officers. Back in the holding cell, I

- 24 -

could still hear him yelling, screaming loud. There was a bang which I understand was him striking the metal divider in his cell. That disrupted not only my proceeding, but the proceedings in Courtroom 2.

So, the defendant apparently has calmed down. I don't know. He's been better now that he's restrained.

\*\*\*

I am prepared, Mr. Hughes, to let you stay in the courtroom for the remainder of the trial if you're willing to remain calm. I am not unshackling you based upon your prior conduct. I did allow the State to complete the examination of Ms. Berry and they put on Officer Bohm. I believe and I find that you waived your right to be present in the courtroom during Ms. Berry's testimony and the remaining testimony of the State based upon your conduct of continually interrupting the State's line of questioning and also arguing the State's [*sic*] rulings in front of the jury. Certainly you are entitled to object, but you are not entitled to question the Court's rulings in the manner in which you did and to argue with the Court and to raise your voice. So, I believe that you waived your right to be present for the remainder of the examination of the technician, Berry, and Officer Bohm.

The State has rested its case. If you wish to present any evidence, I'm going to give you an opportunity to do that at this time and we are going to do the jury instruction conference. As long as you remain calm, do not interrupt and do not raise your voice, I will allow you to stay in the courtroom. *The second you raise your voice, the officers are going to take you out; and you are not going to be brought back in a second time, you will remain out for the rest of the proceedings*

*here today*. Do you understand me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Did you have evidence you want to present?

THE DEFENDANT: I mean, I want to cross examine the witnesses.

THE COURT: Well, you should have thought about that before you interrupted me.

\* \* \*

THE DEFENDANT: Do I get a chance to cross examine the witness, one?

THE COURT: I will give you a chance to call her in your case if you wish to which would allow you an opportunity to cross examine her.

THE DEFENDANT: Thank you.

THE COURT: Will you have any other evidence to present besides that?

THE DEFENDANT: Yeah, at least I'm going to try to present some.

THE COURT: Are you going to remain calm?

THE DEFENDANT: Yes, ma'am. And I apologize for earlier. I'm just, I'm just frustrated. I'm just—

THE COURT: That doesn't make it okay.

THE DEFENDANT: I know it don't." (Emphasis added.)

¶ 76      b. The Court Reviews Defendant's Proposed Exhibits and Witnesses

¶ 77      The trial court asked defendant if he wished to ask any questions of Officer Bohm, advising defendant that Bohm had testified that the hospital was a place of public accommodation. Defendant answered that he wished to question Bohm, and the court said it would allow him to do so.

¶ 78    The trial court then asked defendant to produce any exhibits he wished to admit and said he could attempt to lay the foundations outside the presence of the jury to avoid any "issues." The court reviewed defendant's exhibits and determined they were all inadmissible.

¶ 79    Thereafter, defendant presented his case in chief, starting by recalling Berry.

¶ 80                                    c. Berry

¶ 81    Defendant asked Berry about the events of March 29, 2023. Berry testified that she remembered seeing defendant when two prison guards escorted him in a wheelchair to the ultrasound room. Berry then answered several questions about defendant's degree of mobility, whether he was able to stand (while using a plastic urinal, which Berry left to empty), and whether he was handcuffed. Berry again testified that defendant punched her in the cheek and jaw with what felt like a closed fist, although Berry did not see because she was looking at the ultrasound screen. Defendant introduced a different picture of Berry, also taken that day, which defendant contended showed Berry did not have any injuries.

¶ 82    Defendant then asked if Berry remembered his pushing her hand away, which she did not remember. Defendant next read Berry's address aloud before the jury, which the State objected to as an attempt at witness intimidation. The trial court sustained the objection and said, "Move along to some other question or you're done." Defendant asked, "Jenna Berry, in the name of God, did I hit you?" Berry answered, "Yes."

¶ 83    The following exchange then occurred.

> "THE COURT: Anything else, Mr. Hughes? Excuse me, Mr. Hughes, any other questions?
>
> THE DEFENDANT: I just want the jury, I just want you all—
>
> THE COURT: Sir,—

THE DEFENDANT: I just want you all—

THE COURT:—you cannot—

THE DEFENDANT: I just want them—

THE COURT: Sir, what did I tell you? What did I tell you? If you want to stay in here, don't do that."

¶ 84    Defendant asked when the assault occurred, and Berry answered, "Around 9 a.m." That ended defendant's inquiry.

¶ 85                                    d. Bohm

¶ 86    Bohm testified that he was dispatched to OSF Saint James–John W. Albrecht Medical Center on March 29, 2023, as a result of the battery to Berry. Bohm stated he spoke with witnesses about the incident, including two correctional officers. Defendant asked Bohm if he was aware of the grievance procedure at the prison, and Bohm stated he was not. Defendant then attempted to ask Bohm questions about the grievance he had filed, and the trial court sustained the State's objection. Defendant also asked whether Bohm knew anyone on the jury, and the court sustained the State's objection.

¶ 87    Defendant attempted to ask Bohm about the statement Berry gave him at the hospital, but the State objected based on hearsay, and the trial court sustained the objection. Defendant then began to argue with the court about why he could not ask questions about Berry's statements, explaining that her statements contradicted her testimony. The court, despite being repeatedly interrupted and spoken over, told defendant his questions were improper and called for hearsay. The court excused Bohm and ended his testimony.

¶ 88                                    e. Defendant

¶ 89    The trial court asked defendant if he had any further evidence, and defendant stated

he wished to testify. The court administered an oath and instructed defendant to give testimony from the defense table. The court instructed him to speak clearly into the microphone and reminded him to testify to the facts of "this incident and this incident only," not make a closing argument, which he could do later.

¶ 90　　　　Defendant testified that he went to OSF Saint James–John W. Albrecht Medical Center on March 29, 2023, for an ultrasound. He explained that he was a paraplegic and had a gunshot wound in his spine that prevented him from walking. Defendant then mentioned that he had "evidence here, but I can't introduce it as evidence to you; so, you will never see it." Defendant said he had "ADA attorneys" addressing his gunshot wound and inability to walk. The State objected, and the trial court had to repeatedly tell defendant to stop his testimony so it could address the objection. The court asked for the basis of the objection, the State said the testimony was irrelevant, and defendant agreed to leave out any mention of his lawyers.

¶ 91　　　　Defendant then said, "I filed a grievance challenging the criminal charges against me." The State objected, and the trial court sustained the objection and informed defendant that he "cannot talk about the grievance process and procedure." The following exchange then occurred:

　　　　　　"THE DEFENDANT: Oh, my God. I can't, I can't advocate, I can't put up no defense if I can't mention the misconduct, the—

　　　　　　THE COURT: The administrative process is not relevant to these charges; so, you can move on to some other argument, or some other testimony.

　　　　　　THE DEFENDANT: This is the cruelest thing in the world. The tickets, the guards' statements is the basis of me being criminally charged; and the tickets expunged, threw out because the director of the Illinois Department of Corrections—

THE COURT: Sir, sir,—

THE DEFENDANT:—determined the prison guards had lied—

THE COURT: Sir,—

THE DEFENDANT:—concerning the incidents with the nurse. They determined the prison guards lied.

THE COURT: All right.

THE DEFENDANT: Okay. I'm sorry, [Y]our Honor.

THE COURT: No, it's too late. The jury is—

THE DEFENDANT: Please, [Y]our Honor, I'm sorry, name of God, [Y]our Honor, I'm sorry.

THE COURT: The jury can stay. Take him out."

¶ 92    4. *Closing Argument and the Trial Court's Explanation*

¶ 93    The State then began its closing argument, stating as follows:

"Thank you for your time and attention today. This has been a long trial, longer than I think any of us really anticipated it was going to be, and it's been a little difficult to get through. It's been difficult to get through because the defendant has been, has been uncooperative.

THE COURT: Hold on. Mr. O'Brien, be careful about where you're going with this argument; he's not in here but the rules of evidence are going to still apply.

MR. O'BRIEN: I understand, [Y]our Honor; and I wasn't, I didn't mean to go anywhere other than to say that—

THE COURT: Be careful."

¶ 94    The State then discussed the elements of aggravated battery and identified the

portions of the testimony that satisfied each element. Defendant did not make a closing argument.

¶ 95        The trial court then read the jury instructions and sent the jury to deliberate.

¶ 96        After the jury left the courtroom, the trial court explained the reasons for defendant's removal from the courtroom and asked the State to confirm if what the court stated was accurate. The following exchange occurred:

"Okay. We're still on the record. The jury's been excused. Mr. Hughes is not in here. I have no intention of bringing him back in here today. However, we don't want him to leave just yet, because we need to see what the verdict is. I do want the record to very clearly reflect and please, Mr. O'Brien, if I misstate anything, please clarify it for the record, because I'm not sure that the that the record is going to understand just how inappropriate and disrespectful Mr. Hughes was throughout the trial. He clearly was trying to sabotage the trial when he was questioning Ms. Berry saying, you know, under oath or according to God or whatever he was saying over and over again, he's forming tears in his eyes and he's getting very emotional. He was changing his attitude and his mannerisms trying different ways to get things in. He knew full well what the lines were in terms of what he could ask questions about and what he couldn't; and he was intentionally interjecting things into the record that I previously ruled were not admissible. He did that multiple times. He would interrupt. When there was an objection by the State, he would make his argument without giving me a chance to speak and, because I believe he was trying to get information in front of the jury that was not appropriate. He cannot try to create a mistrial by his own actions and think he can stay in here and continue to do it. And so, since he continued to violate my rulings,

argued with me, didn't stop when an objection was made, I had him removed; and I have no intention of bringing him back in here until after the verdict is read.

Mr. O'Brien, did I accurately state what happened in here?

MR. O'BRIEN: Your Honor, if anything, [Y]our Honor, I think you understated the idea that immediately before, in the moments before he was taken out of the courtroom, he had begun raising his voice, he had begun, he was directing his, he was directing to you in a loud tone whatever his thoughts were. He was not cooperative with [Y]our Honor, he certainly was not cooperative with the officers; and I could see right here the officers were, he was, I mean, frankly, in his motions being obstructionist with the officers who were trying to be, take him out of the courtroom. But if anything, I'd want to emphasize the amount that in his last few sentences he had raised his voice and become belligerent.

THE COURT: Yes, I do agree that he was getting louder as I was asking the guards to take him out, he was getting very loud; and you're correct, he seemed to be trying to hinder his exit from the courtroom while the jury was still in here, and he was engaging in what I would say were inappropriate comments.

So, that's the best I can do to explain why he was not in here. I believe that we did everything we could to allow him to stay in here. I gave him every opportunity to cross examine witnesses, but he continually violated my rulings and my orders and interfered with the administration of justice."

### 5. *The Verdict*

The jury found defendant guilty of aggravated battery.

### D. Sentencing

¶ 100    In February 2024, the trial court conducted a sentencing hearing. During that hearing, defendant stated, "[W]hen I first appeared in court when I asked for help; and you say no, you're not getting appointed no counsel. You are *pro se*." Ultimately, the court sentenced defendant to 10 years in prison, to be served consecutively to his current prison term.

¶ 101    This appeal followed.

¶ 102                                    II. ANALYSIS

¶ 103    Defendant appeals, arguing that the trial court erred by (1) failing to specifically admonish him that if he were removed from the courtroom, he would be completely unrepresented for those portions of the proceedings or (2) in the absence of such a specific warning, failing to appoint standby counsel to represent defendant after he waived his right to be present at trial by his misconduct. Defendant acknowledges he failed to raise the issue in the trial court but argues the court committed second-prong plain error.

¶ 104    We disagree and affirm.

¶ 105                              A. The Applicable Law

¶ 106                              1. *The Plain-Error Doctrine*

¶ 107    The plain-error doctrine is a well-established exception to forfeiture principles and allows a reviewing court the discretion to consider unpreserved error under two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Moon*, 2022 IL 125959, ¶¶ 19-20. "The typical first step in an analysis under either prong of the plain-error doctrine is to determine whether any clear or

obvious error occurred at all." *People v. Hood*, 2022 IL App (4th) 200260, ¶ 121.

¶ 108                                   2. *A Defendant's Right To Be Present*

¶ 109          Although both the United States and Illinois Constitutions afford criminal defendants the general right to be present at all critical stages of trial proceedings, this right is not absolute. *People v. Lindsey*, 201 Ill. 2d 45, 55-56 (2002) (a "defendant may waive the right to be present at trial by consent or, as in [*Allen*], by misconduct" (citing *Illinois v. Allen*, 397 U.S. 337, 343 (1970), and citing *Snyder v. Massachusetts*, 291 U.S. 97 (1934), and citing *United States v. Veatch*, 674 F.2d 1217, 1224-26 (9th Cir. 1981), and citing *People v. Bean*, 137 Ill. 2d 65, 80 (1990))). Rather, a defendant has a constitutional right to be present at any critical stage of the proceedings if his or her presence would contribute to a fair proceeding as contemplated by the due process clause of the fourteenth amendment. *Id.* at 57 (citing *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)).

¶ 110          Similarly, under the Illinois Constitution, a defendant has a constitutional right to be present only when his or her absence would result in the denial of a substantial right in the proceeding, such as "the right to confront witnesses, the right to present a defense, and the right to an impartial jury." *Bean*, 137 Ill. 2d at 81. Although "courts must indulge every reasonable presumption against the loss of constitutional rights," a defendant may relinquish his or her right to be present by consent or misconduct. *Allen*, 397 U.S. at 343.

¶ 111          In *Allen*, the United States Supreme Court wrote the following about a defendant's relinquishing his right to be present at his trial:

"Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights [citation], we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the

- 34 -

judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." *Id.* at 343-44.

¶ 112                                  B. Defendant's Arguments on Appeal

¶ 113        Defendant argues that, as a result of his removal from the courtroom, he "was completely unrepresented during two significant portions of his trial," which "deprived [him] of his constitutional rights to be present and to due process." Specifically, defendant asserts the following in his opening brief:

"Though the defendant's removals from the courtroom were the result of

his own misconduct, he cannot be said to have waived his constitutional rights because the judge never specifically admonished him that such misconduct would result in him being completely unrepresented during trial. Absent the necessary admonishments and waiver, the defendant's removals from the courtroom violated his rights to be present and due process, and rose to the level of plain error. *People v. Turner*, 2024 IL App (1st) 211648, ¶ 66. This Court should reverse the defendant's conviction and remand the cause for a new trial.

* * *

The defendant does not argue that the judge's findings that his conduct warranted his removal from the courtroom were arbitrary or capricious. However, because the defendant was *pro se* and did not have standby counsel, his removal implicated additional due process concerns because it left him completely unrepresented for significant portions of the trial, including the testimony of two State's witnesses and closing arguments, and cut short his own testimony. Though the judge gave the defendant warnings that his disruptive conduct would result in his removal from the courtroom, she never informed him that his removal would leave him completely without representation for those portions of the trial. Because the judge never gave the defendant any specific warning that his conduct could lead to him being completely unrepresented during trial, her orders removing him from the courtroom were based on the wrong legal standard and constituted abuses of discretion. *Turner*, 2024 IL App (1st) 211648, ¶¶ 66, 69."

¶ 114    Defendant does not challenge the trial court's acceptance of his waiver of his right to counsel or the court's decision not to appoint standby counsel.

¶ 115          C. The First District's Opinion in *People v. Turner*

¶ 116          Because in defendant's argument to this court he relies entirely upon the First District's opinion in *People v. Turner*, 2024 IL App (1st) 211648, we discuss that case in detail.

¶ 117          In *Turner*, "the trial court regularly reprimanded defendant [during] pretrial proceedings for his obstreperous behavior and warned him that if he continued, he would be 'kicked out of the courtroom,' while the trial proceeded in his absence." *Id.* ¶ 54. In fact, the trial court did remove the defendant on multiple occasions "because he would not stop arguing with or interrupting the court." *Id.* On the day of the defendant's jury trial, the defendant persisted in arguing with the trial court, including after the venire was present for jury selection. *Id.* ¶¶ 21-23. After he disregarded the court's order to stop speaking in front of the venire, the court had the defendant removed from the courtroom, and a jury was selected in his absence. *Id.* ¶¶ 24-25. Outside the presence of the jury, the court noted that the defendant had continued to disrupt *voir dire* even from "lockup" by "continually pound[ing], in some manner," to the point that the court had to make a joke about construction. *Id.* ¶ 26. The court stated that the defendant had " 'forfeited *** his right to be present.' " *Id.*

¶ 118          On appeal, the defendant argued that the trial court violated his constitutional rights when it removed him from the courtroom during the jury selection process. *Id.* ¶ 46. The First District agreed that the defendant's "unrelenting argument and disrespect for the trial court during jury selection merited his removal" but noted that the defendant was *pro se* and did not have standby counsel to represent him during his absence. *Id.* ¶ 55. The First District identified the issue as "whether defendant's absence from the courtroom, as a *pro se* litigant with no standby counsel, violated due process." *Id.* ¶ 56.

¶ 119          The First District distinguished between (1) cases in which *pro se* defendants

without standby counsel were removed from the courtroom "involuntarily" as a result of their misconduct and (2) "cases where the *pro se* defendants knowingly and voluntarily absent themselves from the proceedings or explicitly refuse to engage in any defense of their case." *Id.* ¶¶ 59-60. The court believed the case before it aligned with the first category, which implicated due process concerns not implicated by the second category. *Id.* ¶ 61.

¶ 120     The *Turner* court then noted that in the case before it, "[the] defendant was never specifically warned that his removal would leave the defense table empty with no one to represent him." *Id.* ¶ 66. And regarding defendant's removal during jury selection, the court noted that "although defendant received general removal warnings in past proceedings, he was not warned prior to his removal during jury selection," which deprived him of the opportunity to change his conduct and participate. *Id.*

¶ 121     The First District found "[m]ore troubling" the fact that the defendant's removal during jury selection left him with "no legal representation for that procedure" and "no say in the composition of the jury charged with deciding his case." *Id.* ¶ 67. Regarding this point, the First District wrote the following:

> "When a *pro se* defendant is involuntarily removed from court for misconduct, and no one is present to represent him, his constitutional right to due process is necessarily implicated. See *Davis v. Grant*, 532 F.3d 132, 143 (2d Cir. 2008) (finding that an absent defendant cannot protect his constitutionally guaranteed rights to confront witnesses against him, present his own witnesses, question potential jurors, or present a closing argument). An absent defendant without representation in a legal proceeding also poses a danger that the resulting lack of adversarial testing will undermine the accuracy of the truth-seeking process.

*Id.* Furthermore, the judiciary has an interest in 'ensuring that criminal proceedings " 'appear fair to all who observe them.' " ' *Id.* at 144 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)). As the court in *Davis* observed, '[w]e are hard-pressed to think of a circumstance more likely to make an observer question the fairness of a trial than the sight of an empty defense table.' *Id.*

Given these fundamental constitutional concerns, a trial court should ensure that it either (1) has the knowing consent of the defendant to proceed in his absence or (2) provides a specific warning to the defendant with an opportunity to change his conduct, before it finds that a *pro se* defendant knowingly waived his right to any legal representation in the proceeding through his misconduct and subsequent removal." *Id.* ¶¶ 68-69.

¶ 122    The First District concluded that because the defendant was not specifically warned that his removal would leave the defense table empty with no one to represent him, he did not knowingly waive his right to legal representation when he was removed for misconduct during jury selection. *Id.* ¶ 70. The court held that "proceeding with jury selection in defendant's absence, without any representation on his behalf, was a structural error not subject to harmless error analysis." *Id.* Accordingly, the court overlooked the defendant's procedural forfeiture under the plain-error doctrine, reversed the defendant's convictions for being an armed habitual criminal and reckless discharge of a firearm, and remanded for a new trial. *Id.*

¶ 123    In doing so, the First District made the following observations:

"To be clear, we do not condone defendant's behavior. Defendant's conduct before the court was incessantly disruptive, obstructive, and disrespectful, and the trial court did not err in removing him from the courtroom. However, while the trial

- 39 -

court must have discretion to prevent a defendant's contumacious conduct from thwarting the orderly progress of a trial, it must also ensure that the trial proceeds in accordance with due process as guaranteed by the fourteenth amendment. See *Faretta*[ *v. California*], 422 U.S. [806,] 818 [(1975)] (noting that the fourteenth amendment 'constitutionalizes the right in an adversary criminal trial to make a defense as we know it').

To that end, we note that other options were available to the trial court in this difficult situation. The trial court could have appointed standby counsel to proceed on behalf of defendant during jury selection. [Citation.] In this case, however, where defendant persistently argued that he had a right to standby counsel to assist him, despite the trial court's rulings to the contrary, the court may have been hesitant to reward him with the precise outcome he sought through disruptive conduct.

Under the circumstances of this case, where defendant exhibited a persistent pattern of defiant, disruptive, and disrespectful conduct that threatened to thwart the proceedings, termination of his right to represent himself may have been appropriate. *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 76. The right to self-representation is not absolute and may be terminated if the defendant ' "deliberately engages in serious and obstructionist misconduct." ' *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (quoting *Faretta*, 422 U.S. at 834 n.46); see *Rainey*, 2019 IL App (1st) 160187, ¶ 75 (finding that misconduct justifying a defendant's exclusion from trial is the same type of misconduct 'that would justify imposing counsel on an unwilling defendant'). Although not a perfect solution,

terminating defendant's right to represent himself would have been constitutionally permissible." *Id.* ¶¶ 71-73.

¶ 124    D. The State's Response to Defendant's Arguments on Appeal

¶ 125    The State argues that the trial court adequately warned defendant in this case that his continued misconduct would result in his removal from the courtroom and that the trial would proceed in his absence. The State notes that the court admonished defendant that no standby counsel would be provided and defendant's comments on the record demonstrate he was keenly aware of this fact.

¶ 126    The State further contends that defendant was well aware that the jury trial was to be conducted in one day. Indeed, defendant explicitly refused at least three offers from the trial court to continue the jury trial to obtain witnesses or give him additional time to prepare; defendant instead insisted upon going to trial that day.

¶ 127    Given all of the foregoing, the State asserts that defendant's conduct clearly amounted to a knowing and voluntary waiver by conduct of his rights to be present and present a defense. We agree.

¶ 128    E. This Case

¶ 129    1. Turner *Is Distinguishable*

¶ 130    We view *Turner* as distinguishable from the present case.

¶ 131    First, the record shows that during defendant's trial in this case, the trial court repeatedly gave informal warnings that defendant's continued interruptions of the court or his making inappropriate statements in front of the jury would result in his removal. The court also gave defendant two lengthy formal warnings, once prior to defendant's first removal and the second upon the court's returning him to the courtroom, during both of which the court explicitly

and unequivocally stated that (1) defendant would be waiving his right to be present if he continued to engage in misconduct and (2) the trial would proceed in his absence. The court also specifically admonished defendant about what he was doing wrong and the proper way to behave in court, thus giving defendant a clear opportunity to correct his behavior so that he could continue to participate.

¶ 132 Second, the defendant in *Turner* did not receive any warning on the actual day of trial about (1) his being removed and (2) the trial's proceeding in his absence. Instead, the trial court's warnings to the defendant in that case occurred only at earlier hearings. By contrast, the trial court in the present case gave defendant dozens of warnings, including lengthy ones, all on the day of trial.

¶ 133 Third, defendant was able to call both Berry and Bohm and question them extensively. Defendant missed only four total pages of direct examination by the State in which (1) Berry established the foundation for a photograph and (2) Bohm testified that the hospital was a place of public accommodation. See *Bean*, 137 Ill. 2d at 83-84 (holding that reversable error occurs when a defendant's absence results in an unfair trial, which must be determined in light of the whole record, and "[i]f it does not appear that an unfair trial resulted, the defendant's constitutional rights were not violated; that is true even if a defendant's absence in similar circumstances is usually considered to be improper").

¶ 134 Finally, the defendant in *Turner* waffled back and forth between requesting standby counsel and wishing to proceed *pro se*. *Turner*, 2024 IL App (1st) 211648, ¶¶ 6-15. In fact, the defendant in *Turner* was even represented by counsel for several hearings at the very beginning of the case. *Id.* In the present case, however, defendant was never represented by counsel and never requested standby counsel after the trial court informed him at the very beginning of his case that the court would not appoint standby counsel due to the case's simplicity.

¶ 135    2. *The Trial Court's Warnings Put Defendant on Notice of*

*the Consequences of His Misconduct*

¶ 136    Considering this record as a whole, we conclude that the repeated admonitions the trial court gave to defendant regarding his continued misconduct were adequate to put him on notice that if his misconduct continued, he would be removed from the courtroom and the trial would proceed without his presenting a defense. The most explicit statement of the trial court in this regard occurred after defendant had been removed from the courtroom due to his misconduct when Berry was on the stand. When the court later ordered defendant to be returned to the courtroom, the court discussed at length defendant's misconduct and then stated the following:

"As long as you remain calm, do not interrupt and do not raise your voice, I will allow you to stay in the courtroom. The second you raise your voice, the officers are going to take you out; and you are not going to be brought back in a second time, you will remain out for the rest of the proceedings here today. Do you understand me?

THE DEFENDANT: Yes, Your Honor."

¶ 137    Given that (1) defendant had chosen to proceed *pro se* on the very first day of his arraignment in this case and (2) the trial court, commendably following this court's suggested admonitions in *Ward*, 208 Ill. App. 3d at 1081-82, had explicitly informed defendant that no standby counsel would be appointed to assist him, we deem to be completely without merit defendant's claim on appeal that he did not understand that if he were excluded from the courtroom, no one would be present in court to defend the case on his behalf.

¶ 138    In so concluding, we also note that at no time in this record did defendant ever (1) reconsider his decision to appear *pro se* and ask the trial court instead to appoint counsel or

(2) ask for standby counsel to be appointed for him. Defendant stated he had prior litigation experience in a criminal jury trial for attempt (murder) and armed robbery, in which he had represented himself with the assistance of standby counsel. Accordingly, he was familiar with the concept of standby counsel.

¶ 139    Given the extent of defendant's misconduct, we commend the trial court for its extraordinary patience and its efforts to work with defendant to make sure he understood the rules, as well as the consequences for breaking those rules. The court was polite and respectful when telling him not to interrupt. The court also repeatedly stopped the proceedings and spoke to defendant outside the presence of the jury to explain in detail what was expected of him. We agree with the trial court that it did everything it could to allow defendant to remain in the courtroom.

¶ 140    When confronted with a defendant's misconduct, trial courts should strive to make the potential consequences of that conduct clear to the defendant. We understand and sympathize with the difficult situation in which a defendant's misconduct places the trial courts, but the constitutional rights involved require courts to be as clear as they can.

¶ 141    For instance, when a trial court is prepared to conclude that the misconduct of the defendant has reached the point where he has forfeited his right to be present during a portion of the trial (assuming that the court might later give the defendant another chance to be present at later portions of the trial, as long as he does not misbehave), the court should clearly explain what the defendant's removal from the courtroom would mean—namely, that (1) the defendant, by his misconduct, would be giving up his right to be present in the courtroom and (2) the trial would proceed in his absence. If the defendant thereafter would continue to misbehave, his knowing acceptance of the consequences of that misbehavior could not be disputed.

¶ 142    Concerns about making sure the defendant understood the consequences of his

misbehavior are even greater when, as here, the misbehaving defendant is appearing *pro se*, as is his constitutional right. This situation differs from one in which a defendant is represented by counsel who, after the defendant has been excluded from the courtroom due to his misconduct, will nonetheless be able to continue as defense counsel during trial. Although counsel under those circumstances will be at a disadvantage, that situation is still far different from one in which no one remains present in the courtroom to speak on behalf of a defendant who has been excluded due to his misconduct.

¶ 143    3. *We Respectfully Disagree With the Remedy Proposed by the* Turner *Court Regarding the Appointment of Standby Counsel Upon a Defendant's Removal Because of Misconduct*

¶ 144    Even if we had concluded that the warnings the trial court gave defendant regarding his misconduct were not adequate to put him on notice that, if his misconduct continued, he would be removed from the courtroom and no one would be present to defend his interests, we respectfully—but emphatically—reject the remedy proposed by our distinguished colleagues in the First District in *Turner*—and argued by defendant in this case—that the trial court should have appointed standby counsel for defendant so that someone would be representing his interests after the court ordered him removed from the courtroom because of his misconduct.

¶ 145    In *Turner*, the First District agreed that, "similar to *Allen*, defendant's unrelenting argument and disrespect for the trial court during jury selection merited his removal." *Turner*, 2024 IL App (1st) 211648, ¶ 55. The First District further noted that it did not condone defendant's behavior, which it described as "incessantly disruptive, obstructive, and disrespectful." *Id.* ¶ 71. The First District then added the following:

"However, while the trial court must have discretion to prevent a defendant's

contumacious conduct from thwarting the orderly progress of a trial, it must also

ensure that the trial proceeds in accordance with due process as guaranteed by the

fourteenth amendment. [Citation.]

To that end, we note that other options were available to the trial court in

this difficult situation. The trial court could have appointed standby counsel to

proceed on behalf of defendant during jury selection. [Citation.] In this

case, however, where defendant persistently argued that he had a right to standby

counsel to assist him, despite the trial court's rulings to the contrary, the court may

have been hesitant to reward him with the precise outcome he sought through

disruptive conduct.

Under the circumstances of this case, where defendant exhibited a persistent

pattern of defiant, disruptive, and disrespectful conduct that threatened to thwart

the proceedings, termination of his right to represent himself may have been

appropriate." *Id.* ¶¶ 71-73.

¶ 146 We strongly disagree with the First District on each of these points. First, we strongly disagree with the suggestion that the trial court in *Turner* should have appointed standby counsel after it excluded the defendant because of his severe misconduct. Second, we disagree that the trial court should have terminated his self-representation instead of attempting to gain cooperation through a brief exclusion from the courtroom.

¶ 147 a. The Appointment of Standby Counsel for a Disruptive Defendant

¶ 148 We are surprised that the First District concluded that the appointment of standby counsel would have been an appropriate action for the trial court to take in view of the defendant's misconduct because the First District recognized that the trial court's doing so would essentially

reward the defendant "with the precise outcome he sought through disruptive conduct." *Id.* ¶ 72.

¶ 149 But aside from the strong policy of not rewarding a defendant for his misconduct, we reject the notion that standby counsel should have been appointed under the circumstances in *Turner*. After all, what would standby counsel be expected to do? And what would be his role? Traditionally, the role of standby counsel (which, under the best of circumstances, is fraught with uncertainties) is merely to advise the *pro se* defendant about legal procedures to the extent the *pro se* defendant *wishes such advice*, as well as to answer any legal questions the *pro se* defendant may have. See *People v. Simpson*, 204 Ill. 2d 536, 562 (2001).

¶ 150 However, under the circumstances in *Turner*, there would have been no *pro se* defendant remaining in the courtroom to either ask questions of standby counsel or otherwise receive advice from counsel. So, by definition, standby counsel would in no sense be "standby counsel;" instead, any attorney so appointed would essentially be acting as the defendant's counsel.

¶ 151 We note again that defendant in the present case is arguing on appeal that the trial court here should have followed the suggestion of the First District in *Turner* and appointed standby counsel. However, such an appointment would have occurred in the middle of defendant's jury trial and during the presentation of testimony.

¶ 152 How could any attorney appear for the first time in the middle of trial purportedly to represent a defendant who had been barred from the proceedings because of his misconduct? That attorney was not present during the earlier proceedings and almost certainly would need a continuance to be brought up to speed. Yet, as this record shows, defendant in this case repeatedly objected to any delays of his trial. Thus, appointment of standby counsel—or any counsel—almost certainly would have necessitated a delay, contrary to defendant's wishes.

¶ 153 The trial court had repeatedly admonished defendant that he would be removed

from the courtroom if he continued to disrupt the proceedings, and the court had told him from the very beginning that (1) he would not have standby counsel and (2) he would need to conduct the trial by himself with no help. Defendant also repeatedly refused the court's offers to continue the trial and instead insisted that he wanted it completed that day.

¶ 154    We note, as have many courts, that no Illinois court has *ever* reversed a trial court for failing to appoint standby counsel. See *People v. Khan*, 2021 IL App (1st) 190679, ¶ 78 (collecting cases). To the extent *Turner* is suggesting that a trial court commits reversible error for failing to appoint standby counsel, we see this as one more reason to disagree with that decision.

¶ 155    In *People v. Hood*, 2022 IL App (4th) 200260, ¶¶ 88-94, 110-13, this court discussed at length the problem with appointing standby counsel, and we reaffirm now what we wrote in *Hood*:

"In [*People v.*] *Williams*, 277 Ill. App. 3d [1053,] 1059 [(1996)], this court observed that '[t]he appointment of standby counsel frequently creates more problems than it solves.' We first examined the problems created by the ambiguity of the role of standby counsel—namely, that '(1) no "bright line" exists regarding the role of standby counsel, and (2) appointing standby counsel provides a convicted *pro se* defendant the opportunity to argue on appeal that standby counsel either violated the defendant's *Faretta* right to proceed *pro se* or otherwise acted improperly.' *Id.* at 1060.

The ambiguity of the role of standby counsel was highlighted in *McKaskle v. Wiggins*, 465 U.S. 168, 170 (1984), where the trial court appointed standby counsel to assist the defendant in his robbery trial. The defendant repeatedly changed his mind regarding his standby counsel's role, 'object[ing] even to the

court's insistence that counsel remain available for consultation' on one day, then consulting with standby counsel during cross-examination of a witness and asking him to conduct *voir dire* of another witness on the next day. *Id.* at 172. After the defendant was convicted, he filed a *habeas* petition in federal district court, complaining that standby counsel's conduct violated defendant's *Faretta* right to self-representation. *Id.* at 173. The Fifth Circuit Court of Appeals agreed, holding that the defendant's sixth amendment right of self-representation 'was violated by the unsolicited participation of overzealous standby counsel.' *Id.* The Fifth Circuit held that standby counsel is ' " 'to be seen, but not heard' " ' and further explained that standby counsel's role ' "is there for advisory purposes only, to be used or not used as the defendant sees fit." ' *Id.*

The United States Supreme Court disagreed and reversed the Fifth Circuit, holding that the defendant's *Faretta* rights were not violated, and writing as follows:

> '*Faretta* affirmed the defendant's constitutional right to appear on stage at his trial. We recognize that a *pro se* defendant may wish to dance a solo, not a *pas de deux*. Standby counsel must generally respect that preference. But counsel need not be excluded altogether, especially when the participation is outside the presence of the jury or is with the defendant's express or tacit consent. The defendant in this case was allowed to make his own appearances as he saw fit. In our judgment counsel's unsolicited involvement was held within reasonable limits.' *Id.* at 187-88.

The Supreme Court defined those 'reasonable limits' in only two broad

strokes: (1) 'the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury' and (2) 'participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.' *Id.* at 178. ***

*** *McKaskle* instructs only how a trial court should determine disagreements that are brought to its attention, but not disagreements that have occurred off-the-record and of which the court is aware only when a disagreement arises as a posttrial claim of ineffective assistance.

A trial court, when deciding whether to appoint standby counsel, can and should consider these potential problems. We note that other courts have agreed with and applied this court's analysis in *Williams*. See *People v. Curry*, 2022 IL App (2d) 210260-U, ¶ 73 (citing *Williams* and affirming the trial court's denial of standby counsel); *People v. Hui*, 2022 IL App (2d) 190846, ¶ 63[, 198 N.E.3d 305] (same); *People v. Khan*, 2021 IL App (1st) 190679, ¶ 78, 186 N.E.3d 431 (same); [*People v. *]*Ellison*, 2013 IL App (1st) 101261[, 987 N.E.2d 837] (same); [*People v. *]*Pratt*, 391 Ill. App. 3d [45,] 57[, 908 N.E.2d 137 (2009)] (same); *People v. Smith*, 377 Ill. App. 3d 458, 461, 878 N.E.2d 1222, 1225 (2007) (same); *People v. Phillips*, 392 Ill. App. 3d 243, 265, 911 N.E.2d 462, 483 (2009) (same); *People v. Parker*, 335 Ill. App. 3d 474, 486, 781 N.E.2d 1092, 1102 (2002) (same).

Of particular note, in *People v. Mazar*, 333 Ill. App. 3d 244, 250-51, 775 N.E.2d 135, 141 (2002), *abrogated on other grounds by*, *People v. Breedlove*, 213 Ill. 2d 509, 515-16, 821 N.E.2d 1176, 1180 (2004), then-appellate court Justice

Anne Burke, in affirming the trial court's denial of the defendant's request for standby counsel, (1) discussed the problems associated with the appointment of standby counsel that this court identified in *Williams* and (2) cited *Williams* with approval, stating '[*Williams*] emphasizes the problems with appointment of standby counsel ***.'

* * *

We note that this case illustrates yet *another* problem that the appointment of standby counsel can create. In this case, defendant intentionally and repeatedly misbehaved before the trial court and the jury. He was removed from the courtroom on several occasions. Yet, defendant's outrageous behavior could very well have been his trial strategy, however unwise. Indeed, defendant's very argument on appeal is that his convictions should be reversed because his absence from his jury trial, without standby counsel to step in, prejudiced him.

If defendant's trial strategy *was* to prejudice the jury or claim that the trial court was biased against him, what would standby counsel do if, upon execution of the 'removal from the courtroom portion' of defendant's trial strategy, standby counsel was called upon to participate? Standby counsel could not, within the bounds of professional conduct, continue with defendant's strategy. At that point, defendant's strategy would be overborn, which *McKaskle* instructs cannot be done without violating a defendant's *Faretta* right.

Although this example (and defendant's conduct in this case) may be extreme, it demonstrates how standby counsel can be placed in an ethical and legal conundrum—unable to follow the rules of professional conduct without violating

the Supreme Court's command in *Faretta*.

This case also presents the same concern identified by the Second District in *Hui*, 2022 IL App (2d) 190846, ¶ 63,[ 198 N.E.3d 305,] that the appointment of standby counsel 'provides an unsuccessful *pro se* defendant the opportunity to argue on appeal that standby counsel either violated his right to proceed *pro se* or otherwise acted improperly.' " (Emphases in original.)

¶ 156    b. The Problem With Terminating Defendant's Self-Representation

¶ 157    We also disagree with *Turner* to the extent it encourages a trial court to terminate a defendant's rights to self-representation because of his misconduct in court, which may not be appropriate in every case and is certainly not in this one.

¶ 158    The First District in *Turner* seems to be saying that termination of the defendant's right to self-representation would have been permitted, but it is hard to square that holding with *Turner*'s own logic. Surely the failure to specifically warn the defendant of the loss of his right to self-representation would be just as problematic as his removal from the courtroom during trial. After all, the trial court *repeatedly* gave pretrial warnings to the defendant in *Turner* that he could be removed for misconduct but never warned him that his right to self-representation would be forfeited.

¶ 159    Moreover, the defendant in *Turner*, right before going on the continuous rant that got him removed, informed the trial court that he was " 'actually seeking legal representation at this moment as well.' " *Turner*, 2024 IL App (1st) 211648, ¶ 23. Here, the record does not suggest that defendant's conduct was intended to prompt the appointment of appointed counsel and the end of his self-representation, but that may not be so in other cases. Requiring trial courts to appoint counsel in such circumstances gives disruptive defendants a trump card to get the outcome they

want that the trial court just denied them. Such blatant gaming of the system cannot be tolerated or enabled.

¶ 160                                    c. Dealing With Disruptive Defendants

¶ 161        "Defendant, convicted of first degree murder, gamed the system and got away with it." *People v. Seal*, 2015 IL App (4th) 130775, ¶ 38 (Steigmann, J., specially concurring).

¶ 162        So did the defendant in *Turner*, who was convicted of multiple serious felonies.

¶ 163        Trial courts, as well as courts of review, must be alert to efforts to game the system by defendants and must take steps to *not* let them get away with it.

¶ 164        A frequent first step by defendants seeking to game the system is to demand the right of self-representation. We reaffirm what this court wrote on that subject in *Hood*, 2022 IL App (4th) 200260, ¶ 108:

> "A defendant who has been offered counsel in a serious case and who rejects that offer must live with the consequences of his decision to exercise his right of self-representation, no matter how imprudent that decision may seem. And that defendant is deserving of no pity for the consequences of his imprudent decision. Accordingly, we emphatically reject defendant's argument that the trial court's denial of standby counsel was erroneous because it left him disadvantaged in this litigation."

¶ 165        An important first step for the courts in rejecting a defendant's efforts to game the system is to recognize, as we wrote in *Hood*, that a defendant who rejects counsel and insists on representing himself is "deserving of no pity for the consequences of his imprudent decision." *Id.*

¶ 166        Similarly, a defendant who engages in serious, repeated misconduct is deserving of even less pity for the consequences of his conduct.

¶ 167                    III. CONCLUSION

¶ 168          For the reasons stated, we affirm the trial court's judgment.

¶ 169          Affirmed.

¶ 170          JUSTICE DOHERTY, specially concurring:

¶ 171          I concur in the affirmance of the trial court's judgment in this case, and I join the majority's opinion in all respects except section II.E.3.c (Dealing with Disruptive Defendants). Our role is to decide the facts of this case, not to opine on how other cases should be addressed under different facts. The question of whether a defendant's disruptive conduct is an attempt to "game the system" is a fact-dependent one, and such a conclusion should not be assumed in every case in which there is courtroom misbehavior. While I agree that appointment of counsel for the *pro se* defendant was not a viable option here, whether it might be required under different facts is a question we need not reach. The issue would not, in any event, be one of "pity" for the defendant, but a question of whether the court might fashion an appropriate response that upholds the integrity of the proceedings while minimizing any prejudice to the defendant.

*People v. Hughes*, 2025 IL App (4th) 240514

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Livingston County, No. 23-CF-253; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Fletcher P. Hamill, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Michael Regnier, State's Attorney, of Pontiac (Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |